Argued and submitted November 7, 1991, decision of Court of Appeals and judgment
of circuit court affirmed June 5, 1992

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## MARK JOSEPH THOMA,
*Petitioner on Review.*

## (CC 8908 34540; CA A64111; SC S38156)

834 P2d 1020

John P. Manning, Portland, filed the petition and argued the cause for petitioner on review.

Janet A. Metcalf, Assistant Attorney General, Salem, filed the response and argued the cause for respondent on review. With her on the response were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

GILLETTE, J.

## GILLETTE, J.

In this criminal case, defendant was charged with murder and felony murder in the strangulation death of Trayci Thomson. At his trial, defendant offered evidence that another man claimed to have killed the victim. The trial judge excluded the testimony. Defendant was convicted of both charges. He appealed to the Court of Appeals claiming, *inter alia*,[1] that the trial court's ruling excluding evidence of the other man's admissions violated both defendant's right to offer such evidence under the Oregon Evidence Code, OEC 804(3)(c), and his right to due process under the United States Constitution, US Const, Amend XIV. The Court of Appeals affirmed the convictions without opinion. *State v. Thoma*, 106 Or App 774, 810 P2d 882 (1991). We allowed review to address the important evidentiary and constitutional questions involved, and now affirm.

We set out the facts at some length, in order to place the excluded evidence in context. In view of the jury's verdict, we state the facts that the jury was permitted to hear in the light most favorable to the state. *State v. Pinnell*, 311 Or 98, 100, 806 P2d 110 (1991). Thomson, a 23-year-old prostitute, left the company of a friend sometime in the early evening hours of Friday, April 7, 1989, to "turn a trick." The friend waited for Thomson, but she never returned.

On that same afternoon, defendant met with Velda Ann Mullen. Defendant and Mullen were lovers, although each was married to someone else. Defendant was driving a blue Ford van that had two seats and a carpeted interior. Defendant and Mullen went out drinking and visiting. Sometime during their travels, they had sex in the back of the van. At one point they stopped at a local truck stop. Both were drinking significant amounts of alcohol.

Defendant drove the van into northeast Portland, where he told Mullen that he wanted to find a prostitute who would have sex with the two of them and that he would then rob the prostitute. Mullen said that she did not want to have sex with someone else. Defendant slapped Mullen a few times.

---

[1] Defendant made other assignments of error in the Court of Appeals, but he does not renew them before this court.

Defendant contacted two prostitutes who refused his proposal. The third prostitute whom he approached was Thomson. Mullen refused to be involved in sex with Thomson and defendant. Thomson then agreed to have sex with defendant in the back of the van for $20. Defendant paid her. Mullen drove the van around while the other two were in the back. Mullen could not see what was occurring and heard no screams or other indications of a struggle.

After driving around for some time — Mullen thought it may have been for as long as an hour and a half — Mullen stopped the van near Jantzen Beach, because she wanted defendant to drive. Looking into the back of the van, she saw Thomson, nude, lying very still. Defendant told Mullen, "I think I have gotten a little too rough with her." Defendant showed Mullen a black strap that resembled an automobile fan belt and said that he had strangled Thomson with it.

Defendant instructed Mullen to cover the body with the victim's clothes while the van was stopped at a gas station. Defendant paid for the gas with the $20 that he first had given to, and then taken from, Thomson. At defendant's direction, Mullen searched Thomson's clothing for other money, but found none.

Defendant drove the van from the gas station along a road that leads to Hayden Island. Driving to a sandy area, defendant stopped the van, opened the rear doors, and pulled Thomson's body out of the van. He was gone about 15 minutes. When defendant returned without the body, he and Mullen left the area. Somewhere along the road, defendant threw some of Thomson's clothes out the window. (The clothes never were recovered.) Mullen could see that defendant had scratches on his face and neck that he had not had before being with Thomson.

Defendant drove Mullen home, arriving sometime between 2 and 3 a.m. Mullen's husband was awake when she arrived and was very angry with her. Mullen was upset and crying. She told her husband that she had been involved in a murder. He did not believe her at the time.

Mullen saw defendant a few more times. He also called her at home repeatedly, wanting to know if she had

been contacted by the police and warning her to keep quiet about what had happened.

Defendant's wife awakened when he returned home from the fatal drive. She noticed that he had scratches on his face that looked like fingernail scratches, as well as scratches on his chest and back. His knees were bleeding. His lips were swollen, and there was a bruise on his neck. He had not had any of these injuries the previous morning.

The next morning, defendant's wife noticed some jewelry and clothing in the back of the van. Defendant told her a story — one that he later admitted at trial was not true — to the effect that he had been out with a male friend whose prostitute girlfriend had died suddenly of a drug overdose. According to defendant, the friend then borrowed the van to get rid of the body. The jewelry came from this dead woman, defendant said. Defendant later threw the jewelry out of the van as he and his wife were out driving. Later, defendant took the carpet out of the back of the van and scrubbed it and the metal flooring underneath the carpet. Defendant seldom cleaned his van, and his wife had never seen him remove the carpet before.

Thomson's nude body was found about 4 p.m. on Saturday, April 8. Her body was on an embankment, in a patch of blackberry bushes. There was no sign of a struggle in that area. It took police 17 days to learn the identity of the victim.

The following month, the police released some of the details of Thomson's murder in their "Crime Stoppers" series, a program designed to seek the help of the public in resolving unsolved crimes. The details included the facts that Thomson had been strangled and that her body was found on Hayden Island, but did not include the specific site at which the body was found or the fact that the body was nude.

At the urging of a friend, Mullen finally went to the police in the middle of August and identified defendant as Thomson's murderer. Although the appearance of the area had been altered in the interim because of construction, Mullen was able to take police to the precise spot where

Thomson's body had been left on Hayden Island. Defendant was arrested and charged with Thomson's murder.[2]

At trial, defendant testified in his own defense. His version of the events of the afternoon and evening of April 7, 1989, basically tracked the non-incriminating portions of Mullen's testimony and denied the incriminating parts. According to defendant, Mullen left him that evening at the local truck stop while she went off in the van on errands of her own. Mullen, defendant testified, was a physically strong woman. She returned once, and defendant saw a person lying in the back of the van. Mullen told defendant that the person was someone that she and defendant were supposed to drop off on the way home. Defendant refused to drive, because the van's license plates had expired and he had been drinking. Mullen left again, returning an hour later. Defendant then drove Mullen home and went home himself. According to defendant, the scratches that he had on his face and body were the result of an altercation at the truck stop.

Before trial, the state moved to exclude certain hearsay evidence that it believed that the defense intended to offer to the effect that another person, a drug dealer named William Pierce, had admitted murdering Thomson before defendant became a suspect. After an evidentiary hearing, the trial court granted the state's motion on the ground that this exculpatory evidence was not sufficiently corroborated to give it indicia of reliability that would justify its admission as a statement against penal interest under OEC 804(3)(c) or that would require its admission under *Chambers v. Mississippi*, 410 US 284, 93 S Ct 1038, 35 L Ed 2d 297 (1973), both discussed *infra*.

The excluded hearsay evidence may be summarized as follows: Detective John Ingram, one of the investigators in the Thomson murder case, interviewed Michael Lawson on

---

[2] Defendant tried to silence Mullen. While in jail awaiting trial, he conspired with a fellow inmate, Robinette, who was due to be released, to have Mullen killed. Money for the murder was to be paid to Robinette by defendant's wife. Defendant overestimated the loyalty of his spouse. She alerted police to the scheme and they arrested Robinette. He was convicted of conspiracy to murder Mullen, and his conviction was affirmed on appeal. *State v. Robinette*, 106 Or App 570, 810 P2d 881 (1991).

several occasions concerning Thomson's friends and associates. Among the names Lawson gave him were those of William Pierce and Jesse Turner. In a later interview, Lawson told Ingram that Pierce had implied to Lawson that Pierce was directly involved in the Thomson homicide by saying to Lawson, "We knew she was a snitch, we handled it."

Two other men also told Ingram that Pierce had claimed to them that he was Thomson's killer. Earnest McGee reported that Pierce had told him that Jesse Turner had given Pierce "something" to kill Thomson. Duke Albert Martin, another intimate of Pierce's, told officers that "Busy" (which was Pierce's street name) had admitted killing Thomson because "[t]he bitch had crossed him and he killed her by strangling her and dumped her in Delta Park."[3]

A question naturally arises as to why Pierce would wish to kill Thomson. The evidence suggests a motive. On April 7, 1989 — the date on which Thomson was killed — an incident occurred that could have caused Pierce to believe that Thomson was cooperating with the police in an undercover drug investigation.

Thomson, whom the evidence shows was described by Pierce as "his woman," knew a man named Dan Green. Thomson and Green were friendly, often going to the store and other places together. Green worked as a "doorman" for a drug-selling operation run by Pierce and Turner. Green also was working undercover for the police. On the fatal Friday, Green was purchasing drugs from Turner while he, Turner, and two women were sitting in a car. One of the women discovered that Green was wearing a "body wire." That woman and Turner got out of the car and discussed the matter. Pierce and Thomson arrived. Not surprisingly, Green became afraid for his safety. He ran. Shots were fired. Green eventually was able to escape his pursuers and call for police assistance. Defendant argued to the trial court and to the Court of Appeals (and renews the argument here) that this

---

[3] Delta Park is not the same place as, or even located on, Hayden Island. At its nearest point, the island is located over a mile north and west of Delta Park. The place where Thomson's body was found is approximately three miles from Delta Park. Questioned by officers as to whether he meant "Delta Park" or "Hayden Island," Martin told the officers that the two names were used interchangeably in his circle of associates.

evidence would permit a jury to conclude that Pierce concluded that Thomson was herself an undercover narcotics informant, and that he killed her for that reason.

As noted, the trial court excluded the foregoing evidence. Defendant claims that he should have been allowed to offer the testimony of Lawson, McGee, and Martin as to the statements that Pierce had made to them. Defendant further claims that he should have been allowed to offer Green's testimony to show Pierce's motive to kill Thomson. Throughout this case, the parties have treated the admissibility of Green's testimony as hinging on the admissibility of Pierce's hearsay statements as reported by Lawson, McGee, and Martin. We turn to the latter question.[4]

Under Oregon law, hearsay evidence that another person has admitted to committing a crime for which a particular individual is on trial is admissible, subject to certain conditions. OEC 804(3)(c) provides:

> "The following are not excluded by [OEC 802 as hearsay] *if the declarant is unavailable as a witness*:
>
> "* * * * *
>
> "(c)   A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*"

(Emphasis supplied.)

Only the emphasized conditions, *viz.*, availability and the existence of corroborating circumstances, are at issue in the present case as it has reached us.

---

[4] Defendant makes no claim that Green's testimony would have been admissible independent of the testimony of the others. We express no opinion concerning that question.

■ "Unavailability" of the out-of-court declarant is a prerequisite to application of the rule of OEC 804(3)(c). OEC 804(1) provides:

" 'Unavailability as a witness' includes situations in which the declarant:

"(a)  Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of a statement;

"(b)  Persists in refusing to testify concerning the subject matter of a statement despite an order of the court to do so;

"(c)  Testifies to a lack of memory of the subject matter of a statement;

"(d)  Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

"(e)  Is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means."

Whether a hearsay declarant is "unavailable" when the out-of-court statement is offered as a statement against penal interest under OEC 804(3)(c) is a preliminary question to be determined by the trial judge under OEC 104(1). *State v. Pinnell, supra*, 311 Or at 114-15. The judge, who is not bound by evidentiary rules except those with respect to privileges, determines the weight and credibility of the evidence and decides whether the standard of proof to be observed in deciding such preliminary questions has been met. *State v. Carlson*, 311 Or 201, 208, 808 P2d 1002 (1991). The proponent of the evidence has the burden of establishing the unavailability of the witness by a preponderance of the evidence. *State v. Pinnell, supra*, 311 Or at 114. If the evidence in the record supports the trial court's ruling, taking into account the standard of proof, the ruling will not be disturbed on appeal. *State v. Carlson, supra*, 311 Or at 214, 219; *State v. Pinnell, supra*, 311 Or at 115.

■ On the present record, defendant failed as a matter of law to establish that Pierce was "unavailable" under OEC 804(1). At the pretrial hearing, counsel for defendant told the

court, "The defense expects that Pierce * * * will be 'unavailable' as defined in OEC 804(1)[(c)] due to a claim of lack of memory." However, the defense offered no evidence to that effect, and evidence offered under this subsection — OEC 804(1)(c) — must include testimony of the out-of-court declarant: "[T]he lack of memory [on the part of the out-of-court declarant] must be established by the witness' own testimony, which clearly contemplates the production and cross-examination of the person." Legislative Commentary to Oregon Evidence Code § 804(1)(c), Kirkpatrick, Oregon Evidence 615-66 (2d ed 1989). The person who *had* interviewed Pierce — Ingram — testified that Pierce denied ever making the statements attributed to him. The record also shows that Pierce was not unavailable:

"Q. [By the prosecutor, on cross-examination of Detective Ingram] Okay. Now, where is William Pierce now?

"A. As far as I know at the Oregon State Penitentiary or OSCI.

"Q. And he's available for testimony?

"A. Yes."

In fact, the prosecutor informed the court that the state had prepared a "transport order" to bring Pierce to Portland. By definition, the foregoing evidence does not meet defendant's burden of establishing that Pierce was unavailable.

Alternatively, defendant might have attempted to establish, under OEC 804(1)(a), that, if called, Pierce would have exercised his privilege against self-incrimination and declined to testify. *See State v. Farber*, 295 Or 199, 209, 666 P2d 821 *appeal dismissed* 464 US 987 (1983) (describing procedure under Oregon law prior to adoption of OEC by which witness could be declared "unavailable" due to exercise of privilege not to testify); *United States v. Pelton*, 578 F2d 701, 709-10 (8th Cir) *cert den* 439 US 964 (1978) (holding, under federal version of OEC 804(1)(a), that a statement by his lawyer that his client will claim the privilege will not suffice to show "unavailability"). However, defendant made no showing of that kind, either.

Finally, there was no stipulation between the parties that Pierce was unavailable. Thus, there was no basis for admitting the hearsay testimony of Pierce through Lawson,

Martin, and McGee (and, assuming one or more of them testified as represented by counsel, the testimony of Dan Green) under OEC 804(3)(c). It follows that the trial court's ruling excluding the testimony of those individuals was proper under OEC 804(3)(c).

From the record before us, it appears that the trial judge excluded this evidence on another ground, *viz.*, its reliability. The court appears to have been aware of the availability issue, but to have focused its attention elsewhere. In upholding the trial court's decision under OEC 804(3)(c), we wish to make it clear that we rely entirely on the "unavailability" criterion. Indeed, we respectfully disagree with the trial court as to its assessment of the reliability of the proffered evidence. Without attempting in this opinion to quantify the precise amount of corroboration necessary in every case, we note that at least the following corroborating circumstances clearly indicate the trustworthiness of Pierce's out-of-court statements:

(1)   There was no known connection between defendant and Pierce;

(2)   Pierce repeated his confession to three different people at three different times;

(3)   Pierce's statements were made before defendant became a suspect;

(4)   Pierce's statements contained some details, such as dumping the body at Hayden Island, although that detail took some translating;

(5)   Pierce's statements that he had killed the victim because she was a "snitch" suggested a motive for the killing;

(6)   The Dan Green incident corroborated the possible motive, and it occurred on the day of the murder; and

(7)   Evidence in the record showed that Green and the victim had opportunities to talk together. All the foregoing corroborating circumstances clearly indicate the trustworthiness of Pierce's out-of-court statements against penal interest. The evidence was sufficient to submit to a jury, assuming that Pierce was shown to be unavailable under

OEC 804(1) and that a proper foundation for the evidence had been laid. Such a foundation was not laid. The trial court therefore did not err in excluding the evidence under OEC 804(3)(c).

■      Defendant's arguments may be construed as contending that, even if he failed to lay a proper foundation for admission of Pierce's hearsay statement from Lawson, Martin, McGee, and Green under OEC 804(3)(c), he nonetheless had the right to introduce that testimony under the Due Process Clause of the Fourteenth Amendment. US Const, Amend XIV. He asserts that this is the holding of *Chambers v. Mississippi*, 410 US 284, 93 S Ct 1038, 35 L Ed 2d 297 (1973). We turn to a consideration of that case.

To be understood, *Chambers* must be explained at some length. Chambers was charged with the murder of a police officer. The murder occurred at the end of a disturbance in the small Mississippi town of Woodville. Before he fell from the fatal gunshot wounds that he had received, the officer twice fired a riot gun toward an alley. The second shot, which appeared to witnesses to be aimed deliberately, hit Chambers. The police concluded that Chambers must have shot the officer. In fact, one eyewitness claimed to have seen Chambers shoot the officer. Chambers was arrested and charged with the murder.

After Chambers' arrest, another man, McDonald, made (but later repudiated) a written confession that he had shot the officer. McDonald told three friends the same thing on separate occasions. There was no evidence that Chambers ever had owned a gun of the type that killed the officer. On the other hand, evidence showed that McDonald had owned such a gun and had bought a replacement gun of the same calibre a few weeks after the shooting.

At his trial, Chambers attempted to show that it was McDonald, not he, who had killed the officer. The state did not call McDonald as its witness, so defendant called him. The defense was permitted to show that McDonald had signed a confession (and later repudiated it) but was not permitted to cross-examine McDonald concerning his repudiation, because Mississippi followed the common-law "voucher" rule

under which a party was deemed to vouch for the truthfulness of its witnesses and was not permitted to cross-examine or impeach them.[5] The defense also was not permitted to offer the statements made by McDonald to his three acquaintances to the effect that he was the murderer. The trial court ruled that such statements were inadmissible hearsay under a Mississippi rule that only statements against pecuniary, not penal, interest were exceptions to the rule against hearsay.[6] On appeal, the Mississippi Supreme Court affirmed. *State v. Chambers*, 252 So 2d 217 (Miss 1971).

On *certiorari*, the Supreme Court summarized Chambers' plight at trial this way:

"In sum, then, this was Chambers' predicament. As a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, [Chambers] was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity. Chambers had, however, chipped away at the fringes of McDonald's story by introducing admissible testimony from other sources indicating that he had not been seen in the cafe where he said he was when the shooting started, that he had not been having beer with [another witness], and that he possessed a .22 pistol at the time of the crime. But all that remained from McDonald's own testimony was a single written confession countered by an arguably acceptable renunciation. Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted."

*Chambers v. Mississippi, supra*, 410 US at 294.

The Supreme Court turned first to the "voucher" rule, to determine whether it was constitutionally permissible to apply it in a criminal case. We cannot discern a clear-cut answer in the Court's opinion. Instead, the Court seemed

---

[5] Oregon's evidence code rejects the "voucher" rule. OEC 607 provides: "The credibility of a witness may be attacked by any party, including the party calling the witness." For a brief discussion of Oregon's abandonment of the "voucher" rule, see the legislative commentary to and accompanying textual discussion of OEC 607 in Kirkpatrick, Oregon Evidence 331-33 (2d ed 1989).

[6] Oregon evidence law is different. A hearsay exception exists for a statement against penal interest. OEC 804(3)(c), *infra*.

to focus very closely on the particular facts in Chambers' situation, stating:

"[A]s applied in this case, the 'voucher' rule's impact was doubly harmful to Chambers' efforts to develop his defense. Not only was he precluded from cross-examining McDonald, but, as the State conceded at oral argument, he was also restricted in the scope of his direct examination by the rule's corollary requirement that the party calling the witness is bound by anything [the witness] might say. [Chambers] was, therefore, effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession."

*Id.* at 296-97. (Footnotes omitted.) The combination of these two aspects of the "voucher" rule, the Court held, "interfered with Chambers' right [of confrontation and cross-examination, under the Sixth Amendment, as applied to the states under the Due Process Clause of the Fourteenth Amendment] to defend against the State's charges." *Id.* at 298.

The Court did not attempt to quantify the degree of constitutional deprivation caused by application of the "voucher" rule alone, however, because that rule had not been applied in a vacuum:

"We need not decide * * * whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses."

*Id.* at 298. The Court turned its analysis to the effect of excluding as hearsay the testimony of the three men to whom McDonald had confessed shooting the officer. The Court reviewed the traditional rule allowing statements against pecuniary interest, but excluding statements against penal interest. *Id.* at 299-300.

The Court stated that it was not required to decide whether, for all purposes, the distinction between the two kinds of statements against interest was valid. It was enough that, in Chambers' case, application of the rule impermissibly denied Chambers the benefit of testimony that was sufficiently reliable to make its admission mandatory under the Sixth Amendment:

"The hearsay statements involved in this case were originally made and subsequently offered at trial under *circumstances that provided considerable assurance of their reliability*. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case — McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest."

*Id.* at 300-01. (Footnote omitted; emphasis supplied.) Under such circumstances, the Court held, it was error to exclude the hearsay statements. *Id.* at 302. Based on the combination of the errors, the Court ruled that Chambers' conviction must be reversed. *Id.* at 303.

Our extensive summary of the *Chambers* decision makes it clear why that case does not aid defendant here. Pivotal to the case was the fact that, under Mississippi law, the exculpatory hearsay testimony was not admissible *in any case*. That is, no matter how reliable the evidence might be shown to be, it would not have been admitted. Such an unyielding rule denied criminal defendants due process. *See Green v. Georgia*, 442 US 95, 99 S Ct 2150, 60 L Ed 2d 738 (1979) (*per curiam*) (hearsay declaration of culpability of murder by co-defendant absolutely inadmissible under Georgia rule); *see also Rock v. Arkansas*, 483 US 44, 107 S Ct 2704, 97 L Ed 2d 37 (1987) (state rule excluding all hypnotically refreshed testimony, including corroborated testimony of defendant herself, denied due process where its effect was to prevent criminal defendant from testifying in her own behalf).

As previously demonstrated, Oregon's rule is not so unyielding. Before a criminal defendant can invoke the Due Process Clause, he or she must show that the state's law denies the process claimed to be due. *Stelts v. State of Oregon*, 299 Or 252, 257, 701 P2d 1047 (1985). In terms of this case, to

be admissible under the due process rule of *Chambers*, the evidence must be inadmissible under the Oregon Evidence Code. Defendant has not made such a showing of inadmissibility here. There has been no violation of his rights under the Constitution of the United States.

The decision of the Court of Appeals and the judgment of the trial court are affirmed.