Argued and submitted May 25, affirmed in part; reversed and remanded in part
November 24, 1999

## STATE OF OREGON,
### *Respondent,*

*v.*

## JOSEPH R. VENTRIS,
### *Appellant.*

## (96-1155; CA A98335)

991 P2d 54

Marc D. Blackman argued the cause for appellant. With him on the brief were Kendra M. Matthews and Ransom Blackman.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

HASELTON, J.

**HASELTON, J.**

Defendant appeals from his convictions, following a trial to the court, on two counts of aggravated murder, ORS 163.095(2)(d),[1] one count of robbery in the first degree, ORS 164.415, and murder, ORS 163.115.[2] He assigns error to the trial court's determinations regarding the admissibility of certain evidence. We conclude that the trial court erroneously excluded defendant's evidence that another person, and not defendant, "personally and intentionally" committed the homicide and that that error necessitates a new trial on the aggravated murder charges only. Accordingly, we affirm defendant's convictions for robbery in the first degree and murder, but reverse and remand the aggravated murder convictions.

The focus of this appeal is the murder of 89-year-old Virgil Crist, in Scappoose, on August 10, 1996. On August 9, 1996, Crist went to the Rose Valley Market in Scappoose to buy some groceries. Because he was elderly and had poor eyesight, Crist asked the clerk's help in finding a $5 bill in his wallet to pay for his purchases. Before finding the bill, the clerk flipped through seven or eight $20 bills in Crist's wallet. Defendant was in the market at that time and was in a position to see the cash in Crist's wallet.

That evening, defendant, an adolescent, attended a party in Scappoose at the home of a friend, Hansen. Defendant drank several beers and became visibly intoxicated. Sometime before 1:00 a.m., defendant left the party and walked to the home of a second friend, Blaha. Defendant

---

[1] ORS 163.095 provides, in part:

"As used in ORS 163.015 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(d) Notwithstanding ORS 163.115 (1)(b) [relating to felony murder], the defendant *personally and intentionally* committed the homicide under the circumstances set forth in ORS 163.115 (1)(b)." (Emphasis added.)

[2] Defendant's convictions for robbery in the first degree and murder were merged into the aggravated murder convictions for sentencing. On appeal, defendant does not challenge either the robbery or murder convictions.

arrived at Blaha's house at about 2:00 a.m. and left approximately 30 minutes later.

Wayne and Georgia Kirby spent the night of August 9-10 in their motor home, which was parked near Blaha's home. Sometime after 2:00 a.m., as Mr. Kirby was lying on the bed next to his sleeping wife, defendant entered the motor home and rifled through Mrs. Kirby's purse. The Kirbys confronted defendant and, after defendant left, Mrs. Kirby discovered that seven $100 bills were missing from her purse.

Between 2:30 and 3:00 a.m. on the morning of August 10, three of defendant's acquaintances saw him "half jogging, half walking" down Oak Street in Scappoose near the intersection of Third Street, roughly a half-mile from Crist's apartment. At some time between 3:00 and 3:30 a.m., Crist was murdered. He was beaten on the head and chest with a rod and stabbed 13 times, and his apartment was burglarized. Crist died as a result of internal bleeding caused by the stab wounds.

At around 4:00 a.m., defendant returned to his friend Hansen's house to sleep. After waking up, defendant suggested to others who had spent the night at Hansen's that they go shopping. Haymayer, another Scappoose High School student, agreed to drive the group. Defendant told Haymayer that he had $800, and showed him a stack of $100 and $20 bills.

Haymayer drove the group to a department store in Beaverton where defendant purchased a pair of pants, a shirt, and some socks. Defendant changed into the new clothes in Haymayer's car, throwing his old pants and shirt into the back of the car and tossing his old socks out in the parking lot. The group later returned to Scappoose.

On August 13, three days after the murder, Scappoose Police Officer Hampton and Detective Corson interviewed defendant about both the Kirby burglary and the Crist homicide. Defendant readily admitted that he had committed the Kirby burglary but claimed that he only took $60

from the purse. When Hampton told defendant that the officers wanted to speak to him about the Crist murder, defendant indicated that he was aware of that investigation. He told the officers that he had heard a description of the assailant that matched his own but denied any involvement in the murder. In fact, no such description had been released.

Hampton then told defendant that the police had recovered a substantial amount of "trace evidence" from Crist's apartment. In response, defendant admitted that he had been in the apartment a few years earlier and that he knew the victim. He again claimed that he was innocent and asked the officers what he could do to prove his innocence. When the officers replied that they would like to inspect the pants that he had been wearing the morning of the murder, defendant orally agreed to "have his pants analyzed" and said that the pants were at his parents' house. He agreed to retrieve the pants later that day.

Defendant also agreed to have the balance of the interview tape recorded. During the tape-recorded portion of the interview, Corson again asked if defendant would "retrieve those pants and show it to us and see if those pants have a tear" in the back pocket. Defendant agreed.

After the interview, Corson, Hampton, and defendant went to defendant's mother's home to retrieve the pants. Defendant went to look for the pants and then returned, explaining that his brother had borrowed the pants and that he did not know where they were.

Later that same afternoon, Oregon State Police Detective McBride, went to Scappoose High School to interview Haymayer (who had driven defendant to Beaverton) about the events of August 10. McBride knew that defendant had confessed to the Kirby burglary and that defendant had observed Crist in the grocery store. Haymayer told McBride that defendant's pants were in his car where defendant had left them on August 10. Haymayer also told McBride that defendant had told him on the morning of August 10, that he had $800, and that Haymayer had seen several $100 and $20 bills in defendant's wallet. Given that information, McBride believed that he had probable cause to seize the pants for both the Kirby burglary and the Crist murder. When

McBride asked Haymayer if he would give him the pants, Haymayer agreed, retrieved the pants from his car, and handed them to McBride.

The next day, August 14, defendant, on his own accord, went to the Scappoose Police offices to speak to Hampton and Corson. Defendant again denied any involvement in the Crist murder. Hampton told defendant that his pants had been recovered from Haymayer's car and asked if defendant would consent to having his pants searched for forensic evidence. Hampton also asked defendant if he would consent to provide body hair and fluid samples. Defendant orally agreed to both of those procedures. In addition, defendant signed the following consent form:

> "You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the property described below. If you consent to a search, anything of value as evidence seized in the course of the search can be used in a court against you. I have read this statement of my rights and understand these rights. I hereby consent to a search without warrant of the following described premises: Auto, premises, auto, or other subject of search."

The consent also listed "several things including the jeans" as items subject to the search. Defendant provided the requested hair and fluid samples and left the station. The ensuing analysis of the pants disclosed transfer stains of Crist's blood, as well as DNA from an unidentified third person.

On August 15, defendant once again voluntarily appeared at the Scappoose Police offices. At that time, McBride told defendant that he knew that defendant had murdered Crist and that "it could make a difference if he killed the old man on purpose or if he * * * was surprised by [Crist] and [Crist's] death was not premeditated." Defendant then stood up and stated:

> "I'm leaving. You guys need to do some more investigating because I wasn't the only guy in there."

Defendant then walked out of the room, but almost immediately returned. Shortly thereafter McBride advised

defendant of his *Miranda* rights. Defendant then made an oral confession and gave a written statement recounting his conduct on August 10. The substance of defendant's statement was that he had burglarized the Kirbys' motor home; that he and two other men had entered Crist's apartment, where Crist had surprised them; that he hit Crist in the head with a metal rod and then ran from the apartment; that when he returned to the apartment 20 or 30 minutes later, he did not see Crist, but instead, his cohorts gave him some papers, a wallet, and a knife; and that, after taking $400 out of the wallet, he threw the wallet and papers away. Defendant further stated:

> "I did not stab him. I don't remember seeing him when I came back the second time. I remember seeing some blood on the knife. I don't remember seeing blood anywhere else. One of my friends gave me the knife. I'm not sure what I did with the knife. I might have thrown it with the rest of the stuff or maybe I dropped it."

Defendant did not name his two alleged accomplices. After signing that statement, defendant was arrested.

Defendant was charged with six counts of aggravated murder, ORS 163.095, one count of murder, ORS 163.115, one count of robbery in the first degree, ORS 164.415 and one count of burglary in the first degree, ORS 164.225. Of the aggravated murder charges, two (counts 1 and 2) alleged that defendant "personally and intentionally" committed the murder, ORS 163.095(2)(d),[3] and the others alleged that defendant committed the murder in an effort to conceal "the commission of a crime" or "the identity of the perpetrator." ORS 163.095(2)(e).

Before trial, defendant moved to suppress his pants and all derivative evidence, including the results of blood and DNA analysis of the pants. Defendant asserted that his pants were seized without a warrant and without his consent and that the ensuing testing was "fruit of the poisoned tree." As amplified below, 164 Or App at 232-33, the state raised a battery of responses, including consent, retroactive consent,

---

[3] The distinction between counts 1 and 2 is that count 1 alleged aggravated murder based on commission of robbery in the first degree, and count 2 alleged aggravated murder based on commission of burglary in the first degree.

third-party consent (Haymayer's), abandonment, and probable cause coupled with exigent circumstances. Ultimately, the court denied suppression, concluding that the police had probable cause to seize the pants as evidence in the Kirby burglary and that exigent circumstances existed because the pants were in Haymayer's car. Alternatively, the court concluded that, even if the seizure was unlawful, defendant's written consent given on the day after the seizure vitiated any illegality.

The case was tried to the court. At trial, defendant sought to present evidence that a third person, Hernandez, actually stabbed and killed Crist—and, thus, that he had not "personally and intentionally" committed the murder for purposes of the two aggravated murder counts pleaded under ORS 163.095(2)(d). As amplified below, defendant proffered evidence that, if believed, would show that: (1) Hernandez and Crist did not get along, in part because Crist had helped get Hernandez evicted from his apartment; (2) Hernandez lied to the police about his whereabouts on the night of the murder; (3) on the morning following the murder, Hernandez's girlfriend found a bloody knife and drugs at the apartment she and Hernandez shared; and (4) Hernandez did not return for several days thereafter. The state objected to that evidence as irrelevant, and the court sustained that objection.

Defendant also proffered the testimony of James Myers, one of his friends, that:

> "[Defendant] spoke to [Myers] on August 10th [the day following the murder] and at that time admitted to [Myers] that he was involved with this incident but he had left and Mr. Hernandez was the individual who'd in fact killed Mr. Crist."

The state objected to that testimony as irrelevant and as hearsay, OEC 802. The court agreed, characterizing the evidence as "unreliable" and further concluding that, even if relevant, defendant's remarks were not a statement against penal interest under OEC 804(3)(c).

The court convicted defendant of the two counts of aggravated murder for "personally and intentionally" killing

Crist, ORS 163.095(2)(d), one count of murder, ORS 163.115, and one count of robbery in the first degree, ORS 164.415. The court acquitted defendant of the remaining aggravated murder counts and dismissed the burglary charge for want of jurisdiction.[4]

On appeal, defendant challenges only his convictions for aggravated murder ORS 163.095(2)(d). Defendant raises two assignments of error: *First*, defendant asserts that the trial court erred in denying his motion to suppress his blood-stained pants and derivative testing evidence. *Second*, he asserts that the court erred in excluding, as irrelevant, his proffered evidence that Hernandez had personally committed the murder and in further ruling that Myers's recounting of defendant's statements on the day after the murder did not fall within the "statements against penal interest" exception to the hearsay rule.

■       We conclude that, although the trial court properly excluded Myers's testimony, it erred in excluding, as irrelevant, defendant's other evidence pertaining to Hernandez. That evidence was relevant to defendant's defense that he did not "personally" commit the Crist murder. That error is so material as to require reversal of defendant's aggravated murder convictions and retrial on those two counts. We further conclude, for guidance on remand, that the trial court properly denied suppression of defendant's pants and of evidence derived from the seizure and testing of those pants.

For clarity and coherence, we begin with the second assignment of error, which encompasses the exclusion of both Myers's testimony and other evidence pertaining to Hernandez. We first consider, and sustain, the trial court's exclusion of Myers's testimony. As noted, the trial court excluded that testimony as, *inter alia,* inadmissible hearsay. Defendant contends, as he did at trial, that his comments to Myers were admissible as a statement against defendant's penal interest. OEC 804(3)(c).[5]

---

[1] Defendant, who was 16, was never waived into adult court on the burglary charge.

[5] Defendant also argues that, to the extent the Oregon Rules of Evidence require exclusion of Myers's recounting of his statements, "those rules, as applied in this case, violate[ ] defendant's due process right to present a defense." *See*

OEC 804(3)(c) provides, in part:

"The following are not excluded by ORS 40.455 if the declarant is unavailable as a witness:

"\* \* \* \* \*

"(c)   A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, \* \* \* that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Thus, to establish the admissibility of exculpatory hearsay statements under that exception, the proponent must establish three elements:

"(1) The declarant must be 'unavailable' to testify as defined under OEC 804(1); (2) the statements must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statements unless he or she believed them to be true (the penal interest requirement); and (3) there must be corroborating circumstances that clearly indicate the trustworthiness of the statements." *State v. Schutte,* 146 Or App 97, 101, 932 P2d 77 (1997).

Here, defendant is correct that his admission that he was "involved" with "the incident" was, to some degree, inculpatory. However, defendant's further remark that he had "left" and that Hernandez had, in fact, killed Crist was not. That is, defendant's statement was the functional equivalent of saying, "I helped with the robbery, but he committed the murder after I left." Thus, "[t]he first element is self-incriminatory and, hence, admissible. But the second element—the element that is critical to [defendant's] present argument—is not." *Wood v. Baldwin,* 158 Or App 98, 103-04, 972 P2d 1221, *rev den* 329 Or 61 (1999).

---

*Chambers v. Mississippi,* 410 US 284, 302, 93 S Ct 1038, 35 L Ed 2d 297 (1973). Defendant did not, however, raise and preserve that constitutional due process argument at trial. Accordingly, we will not consider it.

In that regard, this case is indistinguishable from *Wood*, where we concluded that a third-party declarant's statement indicating his involvement in a criminal episode and further stating that the post-conviction petitioner "had nothing to do with what happened" would not have been admissible under OEC 804(3)(c) in the underlying criminal trial. Indeed, the inapplicability of OEC 804(3)(c) is even clearer here, where defendant was the declarant and was minimizing his own culpability by shifting the blame to another. *Accord State v. Franco*, 151 Or App 472, 479, 950 P2d 348, *rev den* 326 Or 465 (1997) (third party's statement admissible *against* defendant under OEC 804(3)(c) where declarant, by his statement, "exposed himself to the same level of criminal liability as defendant"). The trial court correctly excluded Myers's testimony.

██ ██    We proceed to the trial court's exclusion of defendant's other evidence proffered in support of his theory that Hernandez, and not defendant, "personally" killed Crist. The court excluded that evidence as irrelevant, OEC 401:

"It is at best a circumstantial case putting Mr. Hernandez in town.

"* * * * *

"I don't see any—enough reliability here, enough indicia of reliability, to delve into this. I just don't see it. I'm really reluctant to preclude you from any kind of defense but, you know, it's got to be more than a fishing expedition so I think * * * I'm going to rule against you. I'm not going to allow it. It just doesn't meet the standards that we need to meet for reliable evidence other than just a shot in the dark."[6]

---

[6] The trial court gave no other ground for its ruling. The state argues for the first time on appeal that the evidence can, and should, also be excluded pursuant to OEC 403. Although we can, in appropriate circumstances affirm a trial court's admission or exclusion of evidence on grounds other than those invoked by the trial court, *see, e.g., State v. Nielsen,* 316 Or 611, 629, 853 P2d 256 (1993), OEC 403 is generally not susceptible to such application. That rule, by its nature, requires the reasoned exercise of discretion by the trial court in the first instance. *See, e.g., State v. Huffman,* 65 Or App 594, 604, 672 P2d 1351 (1983). That did not occur here, and we do not believe that the *only* reasoned exercise of discretion would have compelled exclusion of the evidence.

Under OEC 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Applying that standard, we conclude as a matter of law, *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999), that defendant's proffered evidence was relevant and that the erroneous exclusion of that evidence requires a new trial on the aggravated murder counts.

As summarized in defense counsel's offer of proof, defendant's evidence, if believed, would establish the following facts:

- There was animosity between Hernandez and the decedent, Crist. Two years before the murder, Crist and Hernandez had been neighbors and Crist had made statements, or given testimony, that resulted in Hernandez being evicted from his apartment.

- When interviewed by the police about Crist's murder, Hernandez lied about where he was on the night of August 9-10. Although Hernandez told the police that he was working at a mill in Long Beach, Washington, on August 9, 10, and 11, his time cards were to the contrary.

- Hernandez told the police that he was not in Scappoose around the time of the murder. However, he was seen in Scappoose on August 9 within 12 hours of the robbery and murder.

- Hernandez and his girlfriend, DeWolf, had a fight at their apartment in Long Beach sometime between 10:00 p.m. on August 9 and 12:30 a.m. on August 10. DeWolf left and, when she returned the next morning, Hernandez was gone but there were drugs and a knife with a small amount of blood on a table in their apartment. Hernandez did not return for several days.

Defendant contends, and we agree, that that evidence, if believed, would permit a factfinder to conclude that

Hernandez had the motive, opportunity, and means to murder Crist. That, in turn, would tend to make it "more probable," OEC 401, that Hernandez, and not defendant, personally committed the homicide. Thus, the proffered evidence was relevant.

■■ The exclusion of that evidence was not harmless error. That evidence went to the very core of defendant's defense of the aggravated murder counts alleging personal commission of the homicide. Although there was substantial evidence—including defendant's own statements—of defendant's presence at the scene of the crime, there were no eye witnesses to the murder, and the state does not contend, at least for purposes of this appeal, that the transfer blood stains on defendant's pants are necessarily inconsistent with his statements that he was present at the murder scene but did not stab Crist himself. On the totality of the record, we cannot conclude that there was "little likelihood" that the error affected defendant's convictions on the aggravated murder counts. *See, e.g., State v. Hansen,* 304 Or 169, 180, 743 P2d 157 (1987) (describing standard).[7] Accordingly, we reverse and remand for a new trial on counts 1 and 2, alleging aggravated murder.

We turn to defendant's first assignment of error, which challenges the trial court's admission of evidence obtained as a result of the seizure and subsequent testing of defendant's pants. Because it will affect the retrial, we address that assignment.

■ Defendant asserts, as he did at trial, that the seizure of his pants from Haymayer's car and the subsequent testing

___

[7] At oral argument, the state asserted for the first time that the error was necessarily harmless because the trial was to the court and not to a jury. The state reasoned that, because the trial court excluded the evidence on relevancy grounds, we can assume that the court, as the factfinder, would not have given that evidence any weight. We cannot imply such a result.

The state's assumption improperly conflates the trial court's distinct roles as evidentiary gatekeeper and trier of fact. The trial court *necessarily* did not consider the erroneously excluded evidence in determining defendant's guilt. Under our holding, the trial court must consider that evidence in determining defendant's guilt. Given our conclusion that the excluded evidence was material to that determination, we cannot assume that the result would have been, or will be, the same.

were unlawful as warrantless, without consent, and not supported by probable cause combined with exigent circumstances. Defendant argues, principally, that the trial court erred in concluding that defendant's post-seizure written consent to the search of the pants on August 14 related back to ratify the seizure of the pants from Haymayer's car. He contends that there was no effective retroactive consent under *State v. Weaver,* 319 Or 212, 219, 874 P2d 1322 (1994), because:

> "In this case, there is absolutely no evidence that defendant's August 14, 1996, written consent was intended to ratify the police action of August 13, 1996. No one discussed with this sixteen-year-old that he was being asked to ratify a past event; no one discussed the seizure of the pants at all, they simply told defendant that the pants had been recovered and sought to 'reiterate' his consent for them to *search* the pants. The detectives' failure to seek defendant's retroactive consent for the seizure, especially when there is no evidence that defendant knew he could challenge the seizure of his pants, is critical in the light of the fact that it was incumbent on the state to demonstrate that defendant *intentionally* gave the police retroactive consent to seize his pants." (Emphasis in original.)

Whatever the abstract merits of defendant's retroactive consent analysis, we need not address that issue because we affirm the denial of suppression on alternative grounds: (1) The seizure of the pants was lawful based on Haymayer's consent; and (2) the subsequent testing of the pants was lawful based on defendant's pretesting consent of August 14.

As noted, defendant left the pants in Haymayer's car[8] and Haymayer, at Trooper McBride's request, voluntarily retrieved the pants from his car and turned them over to McBride. *State v. Lynch,* 94 Or App 168, 171, 764 P2d 957 (1988), is closely analogous. In *Lynch,* we held that, where the defendant left a duffel bag in a friend's car or house, the friend, by virtue of that entrustment, "had the authority to

[8] The state does not contend on appeal that defendant abandoned the pants.

voluntarily produce the duffel bag in response to [the officer's] inquiry." 94 Or App at 171. We went on to hold, however, that the friend lacked authority to consent to a search of the contents of the bag and, thus, that the ensuing search was unlawful. *Id.*

So too here. Haymayer, like the friend in *Lynch*, had the authority to retrieve and give the pants to the police.[9] He did not, however, have the authority to consent to the subsequent search/testing. Defendant himself had that authority—and, as the trial court found, defendant explicitly and voluntarily consented to testing the pants *before* they were tested. Thus, the results of the testing were lawfully obtained and admissible.

Convictions for murder and robbery in the first degree affirmed; convictions for aggravated murder reversed and remanded for further proceedings.

---

[9] Defendant suggests that this case is distinguishable from *Lynch* because:

"In *Lynch* and [*State v.*] *Peterson,* [114 Or App 126, 834 P2d 488, *rev dismissed* 315 Or 272 (1992)], the officer sought consent from a person in control of a particular area to search that area or to look at something in it. The events that followed were constitutional precisely because the person from whom the officer sought the consent had the authority necessary to give it and, in so doing, it placed the officer in a position from which he could seize evidence in plain view. In this case, the officer did not ask Haymayer to consent to a search or to let him look at something in Haymayer's control. Instead, without *seeing* the evidence or being in a lawful position to see it, the officer asked *Haymayer* to authorize the seizure of *defendant's* property." (Emphasis in original.)

The distinction defendant posits is not borne out by our description of the facts in *Lynch*, which merely indicates that the friend voluntarily produced the bag in response to the police inquiry. In all events, once Haymayer lawfully retrieved the pants, McBride was, even in defendant's formulation, "placed * * * in a position from which he could seize evidence in plain view."