Argued and submitted September 27, 2001, affirmed October 2, 2002

STATE OF OREGON,
*Respondent,*

*v.*

RICHARD CLIFFORD LYTSELL,
*Appellant.*

CR98-1809; A107800

55 P3d 503

Susan F. Drake, Deputy Public Defender, argued the cause for appellant. With her on the briefs was David E.

Groom, Acting Executive Director, Office of Public Defense Services.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Kistler and Brewer,* Judges.

BREWER, J.

_____

* Brewer, J., *vice* Armstrong, J.

**BREWER, J.**

Defendant appeals from his convictions for robbery in the first degree, robbery in the second degree, three counts of burglary in the first degree, two counts of theft in the first degree, and kidnapping in the second degree. The convictions arose from a single episode in which the victim was kidnapped and robbed by a gunman during the course of a residential burglary committed by defendant and two other men. Defendant contends that the trial court erred in excluding hearsay declarations of one of the burglars that implicated the declarant, and not defendant, as the gunman. As a consequence, defendant argues, he was erroneously convicted of the robbery and kidnapping offenses. We conclude that the error, if any, was harmless and affirm.

In assessing whether any error in the exclusion of evidence was harmless, we describe all pertinent portions of the record. *State v. Cunningham*, 179 Or App 359, 361-62 n 2, 40 P3d 1065 (2002). Defendant and two other men, Sandborn and Clippinger, burglarized the home of the victim, Fornataro, on the evening of January 5, 1998. While the three intruders were inside the house, Fornataro and his son returned home. Fornataro testified that he became suspicious when he noticed that lights were on and that items in the house had been disturbed. He went to check his bedroom and, as he entered, he saw two men. One man was rummaging through a cabinet in the room, and his upper torso was hidden from view by the cabinet's doors. The other man was standing about seven feet away, holding Fornataro's handgun in his left hand. As Fornataro entered the room, he asked the two men what they were doing. Startled, the man holding the gun pulled out another gun and pointed it at Fornataro. The gunman then told Fornataro to turn around or he would shoot him. Pressing the gun against Fornataro's neck, the gunman forced him outside onto the deck. Fornataro testified that, once outside, the gunman ordered him to get down on his knees, but Fornataro refused. The gunman and the second intruder then fled through the backyard and over a fence. Fornataro also saw the profile of a third intruder who left the house through a basement window. After the intruders left, Fornataro called the police.

While investigating the crime scene, the police found a pager that belonged to defendant in Fornataro's backyard. In addition, a police artist drew a composite facial sketch of the gunman from Fornataro's description. The sketch strongly resembled defendant. The police also conducted three photo throw-downs. In the first throw-down, Fornataro identified another man, rather than defendant, as the gunman. That throw-down did not include defendant's photograph. The second throw-down included defendant's photograph, and Fornataro identified him as the gunman. In a third throw-down, which also did not include defendant's photograph, Fornataro commented that the person in one of the photos resembled the gunman, but he told the officer that he was certain that it was not the gunman.

The police eventually arrested defendant for the charged offenses. Sandborn also was in custody but later escaped; at the time of defendant's trial, Sandborn had not been apprehended.

Defendant waived his right to a jury trial, and the case was tried to the court. At trial, defendant admitted that he was one of the burglars but denied being the gunman. He testified that he, Sandborn, and Clippinger were in the bedroom when Fornataro entered. According to defendant, when Fornataro entered, defendant was crouched behind the bed looking underneath it, Clippinger was searching through a cabinet, and Sandborn was standing beside the bed. As soon as Fornataro confronted them, Sandborn pulled the gun out and ordered Fornataro to turn around. Sandborn then ordered Fornataro to lead them outside onto the deck. However, when Fornataro turned around, Clippinger jumped out the bedroom window. Defendant followed Sandborn and Fornataro through the house, but he eventually fled through another bedroom window. Thus, according to defendant, Sandborn was the only person on the deck with Fornataro. After fleeing, defendant and Sandborn went to a nearby house that belonged to Cannon, a friend of defendant's mother. Defendant's teenage stepsister, Boyd, was at the house with several of her friends, including Byles. When defendant and Sandborn arrived at Cannon's house, Boyd let

them in and the two men ran down into the basement. Defendant stated that, after cleaning up, he and Sandborn returned upstairs and talked with the girls.

Fornataro testified that, during his encounter with the gunman, he had carefully studied the gunman's face for the specific purpose of later identifying him. Then, in open court, he identified defendant as the gunman. Fornataro also described his thoughts during the photo throw-downs. He explained that, in the first throw-down, he had identified a man whose facial features were similar to defendant's, but he told the officer that the person in the picture was thicker in the neck and torso than the gunman. He stated that he had quickly identified defendant as the gunman during the second throw-down, and, in the final throw-down, he noticed a man who looked similar to the gunman but, even at that time, he had been "absolutely sure [that] it was not the gunman."

Defendant called as a witness the police officer who conducted the first two throw-downs. The officer testified that Fornataro had identified a suspect in 38 seconds during the first throw-down and had identified defendant in two minutes and 35 seconds during the second throw-down. Furthermore, according to the officer, Fornataro mentioned during the second throw-down that another man somewhat resembled the gunman.

Near the end of defendant's case-in-chief, and after defendant testified, he sought to introduce in evidence hearsay declarations allegedly made by Sandborn that implicated Sandborn as the gunman. Defendant made an offer of proof that included the in-court testimony of three witnesses. Two of the witnesses, Boyd and Byles, testified concerning statements Sandborn allegedly made when he and defendant were at Cannon's house on the night of January 5. Boyd testified that Sandborn told Boyd and Byles that he had held the gun to Fornataro's head so that he, defendant, and Clippinger could escape. Byles testified that she heard Sandborn tell the group that "he had made a guy get down on the ground and held [the gun] up to the guy's head." However, she later testified that she did not remember Sandborn's exact words, only that "he said—told the guy to get down—

down to the ground." The third witness, Lohr, testified that several months before defendant's trial, but after defendant had been arrested, Sandborn told her that "he feels bad because [defendant is] going to be doing his time for him."

Defendant argued that the declarations were admissible as statements against Sandborn's penal interest under OEC 804(3)(c)[1] and that the declarations exonerated defendant of any crimes involving the use of the gun. Defendant contended that the statements were sufficiently corroborated because the two witnesses heard "relatively the same statement regarding the gun under the same circumstances." Furthermore, defendant contended that the statements were consistent with the events that occurred during the episode and that Sandborn voluntarily made the statements in surroundings in which he felt comfortable. Defendant urged that Sandborn's comment about defendant doing "his time" was against Sandborn's penal interest, and that it also corroborated Sandborn's statements to Byles and Boyd.

The state conceded that the declarations allegedly made to Byles and Boyd constituted statements against penal interest, but it argued that the declaration that defendant was going to be "doing his time" was not against Sandborn's penal interest. The prosecutor also argued that all of the statements were inadmissible because they lacked sufficient corroboration or indicia of reliability. Specifically, the state focused on an inconsistency in the evidence: Although Byles testified that Sandborn told her and Boyd that he had forced Fornataro to the floor, Fornataro testified that he had refused to comply with the gunman's demand. In addition, the state pointed to the close relationship between

---

[1] OEC 804 provides, in part:

"(3) The following are not excluded by ORS 40.455 if the declarant is unavailable as a witness:

"* * * * *

"(c) A statement which * * * at the time of its making * * * so far tended to subject the declarant to * * * criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

the witnesses and defendant and suggested that bias in favor of defendant may have motivated them to lie.

At the conclusion of defendant's offer of proof, the trial court excluded the proffered evidence. It reasoned:

"The only question before me at this time is the admissibility of the statement. [The state] pointed out, and I previously found, that [Sandborn] is unavailable as defined by the evidence code.

"There are two other criteria that I think have to be met. First, the statement has to be a statement against penal interest. And I do find that the statement of [Sandborn] is a statement against penal interest. That alone is not enough to have it come into these proceedings.

"The Court in [*State v. Thoma*, 313 Or 268, 834 P2d 1020 (1992),] said there needs to be some corroborating evidence. Or to say it a different way, beyond a statement against penal interest there must be some assessment as to the reliability of the proffered evidence.

"The *Thoma* court specifically said that they were not deciding on what unavailable — excuse me, what criterion would necessarily corroborate any statement, but there are seven things that they made reference to, and I would like to contrast or compare to this case.

"There is a connection between the defendant and the declarant.

"There is a known connection between the declarant, the defendant and all of the witnesses.

"The statement was made on a single occasion. And in making that finding, I am finding that the statement that the defendant would be doing his time is so vague as to not be corroboration. And I'm finding it vague for this reason. If the defendant is, in fact, convicted of burglary and no other charge, and if the evidence I have before me is accurate, and if [Sandborn] is never caught, it could still be said that the defendant is doing [Sandborn's] time.

"I further find that the statement of [Sandborn] is factually inconsistent with the testimony that's presented in this case in one particular important element, and that is the statement about whether or not he made the victim get

down on the ground. The testimony in this case by the victim, and it has not been contradicted by the testimony of defendant, is that a gun was pointed to his head, he was walked outside, he was told to get down on the ground, he refused to get down on the ground and, in fact, — and I don't have my — that page of my notes in front of me, but said something to the effect that if you're going to shoot me, you'll have to shoot me standing up.

"So as I analyze the corroboration and the corroboration that's been argued by [defendant], I come to one conclusion, and that's the statement against penal interest and that's the only conclusion I can come to. I do not find that there's sufficient corroboration and the statements of [Sandborn] will be excluded and will not be considered by me."

After the court excluded the statements, defendant called three additional witnesses. The first witness, Stickley, testified that she previously had heard Sandborn use a distinctive expression involving the use of a gun. The second and third witnesses, Lohr and Boyd, identified a photograph of Sandborn. In rebuttal, the state recalled Fornataro, who reiterated that defendant was the gunman and testified that the man in the photograph identified by Lohr and Boyd was not the gunman.

At the conclusion of the trial, the court found defendant guilty of each of the charged offenses. The court explained its ruling as follows:

"When [the victim] first testified, I did with him what I did with every witness, I made an initial evaluation whether I thought he was credible or not credible. Having made that initial determination, I weighed that testimony against every other witness's testimony, and, I think, reevaluated whether I thought he was credible or not credible. That's not true just of [the victim], it's true of every witness who testified.

"I'm troubled by one thing. There are a number of things that cause me to reach my decision. I found [the victim] initially to be a credible witness. And in finding him to be a credible witness, I found his initial account to be credible. When the defendant testified, the defendant put himself in a position that his head was under the bed, that [the victim] could not, should not have been able to see him, and there's nothing the defendant said that changed that.

"[Defense counsel], your argument that his picking [defendant's] picture out of a photo throw-down because the throw-down is overly suggestive, I do not find that it is. That he was the only one who had a threatening look on his face or that it was in the number one position does not give me a satisfactory explanation of why he made the identification. I do find that [the victim's] statement that he studied the face of the gunman for the specific purpose of making an identification later to explain why he made that identification.

"There are a number of other things that I considered in reaching my decision, but I do find the defendant guilty of all of the charges against him."

On appeal, defendant assigns error to the exclusion of Sandborn's statements. He argues that the statements were admissible under OEC 804(3)(c). Moreover, defendant asserts that the error was not harmless because the trial court did not consider the statements in reaching its verdict, and they were critical to the defense theory that Fornataro had misidentified him as the gunman. The state responds that Sandborn's statements were not admissible and, regardless, any error was harmless. We conclude that we need not address the issue of whether the trial court erred in excluding the evidence because, even if it did, there is little likelihood that the error affected the court's verdict.

Evidentiary error is not presumed to be prejudicial, OEC 103(1), and it is considered harmless if there is little likelihood that it affected the verdicts reached. *State v. Johnson*, 313 Or 189, 201, 832 P2d 443 (1992). It is permissible to divide that test into two separate inquiries. First, what was the relative strength of the parties' evidence? And, second, in the totality of the parties' evidence, how significant was the excluded evidence? *Cunningham*, 179 Or App at 382.

As a threshold matter, we reject the state's assertion that, because the trial court was also the trier of fact, its exclusion of Sandborn's statements because they were not sufficiently corroborated "conclusively establishes that, even if the statements had been admitted at trial, the trier of fact would not have been persuaded by them." We rejected a similar argument in *State v. Ventris*, 164 Or App 220, 991 P2d 54 (1999). In *Ventris*, the defendant was charged with murder.

He admitted being at the murder scene but denied committing the murder. The defendant proffered evidence showing that another person had the means, motive, and opportunity to commit the murder. The trial court excluded the evidence on the grounds that it was irrelevant and lacked sufficient indicia of reliability to be admissible.

On appeal, the defendant argued that the evidence was relevant because it was vital to his defense that he did not actually commit the murder. We agreed that the evidence was relevant and that the trial court had erred in excluding it. We concluded that the error was not harmless—despite overwhelming evidence that defendant was present at the murder scene—because there were no eyewitnesses to the crime and the defense theory was consistent with other evidence in the case. *Id.* at 232. In so concluding, we dismissed the state's contention that the error was harmless because the case had been tried to the court, and its exclusion of the evidence necessarily meant that the court would not have given the evidence any weight as the trier of fact. We explained:

> *"The state's assumption improperly conflates the trial court's distinct roles as evidentiary gatekeeper and trier of fact.* The trial court *necessarily* did not consider the erroneously excluded evidence in determining defendant's guilt. Under our holding, the trial court must consider that evidence in determining defendant's guilt. Given our conclusion that the excluded evidence was material to that determination, we cannot assume that the result would have been, or will be, the same."

*Id.* at 232 n 7 (first emphasis added, second emphasis in original). The same is true here. We cannot conclude that the exclusion of Sandborn's alleged declarations was harmless merely because the case was tried to the court. However, important differences between this case and *Ventris* persuade us that there is little likelihood that the exclusion of Sandborn's statements affected the trial court's verdict. We address those differences in the context of the two-step inquiry described in *Cunningham.*

■ We begin by assessing the relative strength of the parties' evidence. Here, as did the defendant in *Ventris,*

defendant admitted being present at the crime scene but denied actually committing the most serious offenses for which he was prosecuted. However, the resemblance between the cases ends there. In *Ventris,* we noted that there was no eyewitness to the crime and that the defense theory was consistent with the other evidence in the case. Here, in contrast, there was an eyewitness to the crimes and the excluded evidence, although consistent with defendant's testimony that Sandborn was the gunman, would not have remedied the inherent weakness of the defense theory in light of the other evidence received at trial.

In a nutshell, defendant's consistent position was that he was hidden from Fornataro's view at all times; therefore, Fornataro could not possibly have correctly identified him as the gunman. In keeping with that theory, defendant testified that only Sandborn went out onto the deck with Fornataro, while Clippinger left through one bedroom window, and defendant fled through another. However, defendant's testimony was contradicted by compelling evidence. The composite sketch based on Fornataro's description of the gunman strongly resembled defendant. In addition, Fornataro's positive identification of defendant as the gunman—both in the second photo throw-down and at trial—contradicted defendant's testimony that he was hidden from Fornataro's view throughout the episode. Although Fornataro mistakenly identified another person as the gunman in the first throw-down, he explained that the person he had identified resembled defendant. Thus, on balance, relatively strong evidence showed that defendant was the gunman. Conversely, defendant's version of events was, to say the least, improbable.

We turn to the second inquiry, namely, how significant, in the totality of the evidence, was the excluded evidence? Because the trial court was the trier of fact, and it explained the rationale for its verdict in considerable detail, the record provides useful information in answering that question. *See State v. Hunter,* 141 Or App 73, 77, 918 P2d 104, *rev den,* 324 Or 78 (1996) (holding that, even if admission of challenged evidence was erroneous, trial court's expressed reasoning for its verdict disclosed that any error was harmless); *see also State v. Shipp,* 27 Or App 675, 679,

557 P2d 244 (1976) (relying, in appeal from conviction in bench trial, on trial court's summing up of evidence before announcing its verdict to show that asserted evidentiary error was harmless).

As noted, the court specifically found that Fornataro's careful study of the gunman's features resulted in an accurate identification. As the court saw things, if defendant's testimony that Fornataro had no opportunity to see him at the crime scene were correct, Fornataro would not have been able to identify defendant as the gunman. The court concluded that the defense theory failed under the weight of those facts.

The question reduces to whether—in light of the trial court's assessment of the evidence that was received—the excluded statements, if admitted, would have been significant to the court. For three reasons, we answer that question in the negative. First, the evidence came from defendant's close friends and a relative rather than from a neutral source. Second, the statement that Sandborn allegedly made in Lohr's presence was ambiguous. Sandborn's statment that defendant was "doing [Sandborn's] time" might simply constitute an acknowledgment that one crime participant had evaded prosecution while the other was in custody. Third, and most important, whether or not the witnesses truthfully testified to statements actually made by Sandborn, those statements do not explain why, in light of defendant's testimony regarding the physical facts, Fornataro was able credibly to identify defendant as the gunman or, for that matter, why he steadfastly asserted that Sandborn was not the gunman.

Defendant remonstrates that flaws in Fornataro's identification of the gunman weakened his testimony. However, that assertion misplaces the focus. The trial court found Fornataro credible and did not believe defendant's version of events. The excluded evidence would not have obviated the inherent implausibility of the defense theory that had, in the court's mind, tilted the balance in favor of guilt. As a consequence, we are convinced that the court's verdict would have been the same even if the hearsay declarations had been admitted. *See Hunter*, 141 Or App at 77 n 7 (evidentiary error

is not prejudicial merely because the matter in dispute was "hotly contested at trial"). Any error in excluding that evidence was harmless.

Affirmed.