Argued and submitted September 7, 2000, decision of Court of Appeals and judgment of circuit court reversed and case remanded to circuit court for further proceedings August 16, 2001

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## CHARLES GLADWIN JOSLIN,
*Petitioner on Review.*

## (95C22378; CA A93988; SC S46491)

29 P3d 1112

Dan Maloney, Deputy Public Defender, Salem, filed the petition for review, brief on the merits, and supplemental memorandum, and argued the cause for petitioner on review. With him on the petition and brief was David E. Groom, Public Defender for Oregon.

Kaye E. McDonald, Assistant Attorney General, Salem, filed the brief on the merits and argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.**

CARSON, C. J.

---

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the consideration or decision of this case; De Muniz, J., did not participate in the consideration or decision of this case.

## CARSON, C. J.

In this criminal case, we must decide whether defendant validly waived his right against compelled self-incrimination during custodial interrogation, under Article I, section 12, of the Oregon Constitution, set out *post*. At the time of his waiver, defendant was unaware that a lawyer whom a family member had hired to represent him had advised, through the family member, that he not speak to police until the lawyer was present. The trial court nonetheless concluded that defendant's waiver was valid and, accordingly, denied defendant's motion to suppress certain statements and other evidence that arose from that waiver. A jury thereafter convicted defendant of murder and other crimes, and the Court of Appeals affirmed from the bench. *State v. Joslin*, 160 Or App 291, 984 P2d 957 (1999). We conclude that defendant did not knowingly waive his right against compelled self-incrimination and that his waiver therefore was invalid. We further conclude that the trial court's error in denying defendant's motion to suppress was not harmless. Accordingly, we reverse the judgment of the trial court and the decision of the Court of Appeals.

The following undisputed facts are taken from the trial court's findings of fact and from the record. On July 27, 1995, a man with a rifle shot and killed a woman, Simonds, at the Salem Family Worship Center in Salem. Defendant soon became a suspect in the shooting.

Later that day, Detective Quackenbush of the Salem Police Department, together with deputies from the Marion County Sheriff's Office, contacted defendant at the home of defendant's sister, Martin. Quackenbush asked defendant whether he was willing to talk about the shooting and explained that defendant was not under arrest and did not have to accompany Quackenbush to any other location. Defendant stated that he was willing to talk to Quackenbush, and he voluntarily agreed to have the deputies transport him to the station house for the Salem Police Department (police station).

Before arriving at the police station, the deputies and Quackenbush conducted a drive-by identification of

defendant by witnesses to the shooting. After stepping out of the deputies' vehicle, defendant initially stated that he wanted to speak to a lawyer; however, within a few seconds, he asked Quackenbush what kinds of questions Quackenbush wanted to ask. Quackenbush responded that he could not speak to defendant because defendant had stated that he wanted a lawyer. Defendant responded that he was willing to continue to talk to Quackenbush. Quackenbush then read defendant his *Miranda* rights from a prepared card, clarified that defendant was not under arrest, and told defendant that he could invoke his rights at any time.

Three witnesses, one of whom asked that defendant remove his shirt, then were asked to identify defendant. Defendant removed his shirt as requested. However, he stated at about the same time that perhaps he should have a lawyer present. Quackenbush asked defendant whether he still was willing to speak to Quackenbush, and defendant responded that he was. Quackenbush again explained that defendant did not have to speak and that he was not under arrest. Defendant responded that he still was willing to speak and to accompany Quackenbush to the police station for an interview.

Meanwhile, Martin had contacted a lawyer, Lipton, who had represented defendant in the past and who agreed to represent defendant for the purpose of the shooting investigation. Martin then called the police station and spoke to Lieutenant Kohlmeyer. Martin told Kohlmeyer that she had hired Lipton as defendant's lawyer and that Lipton had asked her to tell the police to tell defendant that Lipton did not want defendant to speak to police until Lipton was present. Kohlmeyer replied that he would tell defendant that Lipton had been hired, but not that defendant had been advised not to speak, "because that was [Lipton's] job." Martin later called the station two more times, once speaking to someone other than Kohlmeyer and once leaving a message with the communications center, again passing on Lipton's instructions that defendant not speak to police.

After speaking with Martin, Kohlmeyer called the Marion County District Attorney's Office for advice. The responding deputy district attorney, Makler, advised

Kohlmeyer to tell defendant that Lipton had been hired and was available, but not that Lipton had advised defendant, through Martin, not to speak. Makler then called Dr. Suckow, a psychiatrist who worked on a contract basis with Marion County, and asked him to meet with defendant at the police station to determine whether defendant was suffering from a mental disease or defect.

When Quackenbush arrived at the police station, Kohlmeyer told him that Martin had hired Lipton. Quackenbush then approached defendant, who had been placed in a small, windowless interview room. Quackenbush told defendant that Martin had hired Lipton to represent him and that defendant could invoke any of the rights that he already had been read. Quackenbush then asked defendant whether, despite having learned that he now had counsel, he still was willing to talk. Defendant responded that he was.

At about the same time, Detectives Garrett and Myers of the Marion County Sheriff's Office arrived at the police station. Upon their arrival, Kohlmeyer told Garrett that Martin had hired a lawyer for defendant, and Quackenbush advised that he had told defendant as much. However, Garrett and Myers were not told Lipton's name or the substance of his advice to defendant.

Garrett and Myers then began interviewing defendant. At the outset, Garrett again advised defendant of his *Miranda* rights, and defendant signed a card that acknowledged that he understood his rights and had no questions in that regard. A short time later, Suckow arrived and joined the interview. Garrett and Myers then questioned defendant, for about an hour, concerning his physical fitness, his work status, any medication that he might have been taking, and whether he recently had consumed alcohol. Garrett and Myers also questioned defendant concerning a rifle that he owned, and defendant discussed his intent to sell the rifle, due to recent delusions that he had been suffering, as well as a fear that he might harm himself or others. At one point, Garrett and Myers also asked defendant if he would be willing to take a polygraph examination. Defendant responded that that sounded like a good idea, but that he would need to speak to his lawyer first.

Garrett and Myers eventually left the interview room, and defendant spoke to Suckow alone for about 10 to 15 minutes. At that time, defendant made statements about his mental health. Garrett and Myers then returned to the interview room and told defendant that he had been identified as the person who had shot Simonds. Defendant responded that he wanted to talk to his lawyer before speaking any further. Garrett and Myers stopped their questioning and arrested defendant.

Defendant later was indicted for murder and other crimes. He moved to suppress, among other things, statements that he had made to Quackenbush, Garrett, Myers, and Suckow, as well as any of Suckow's reports or testimony concerning his observations of defendant, upon the grounds that that evidence was obtained in violation of his state and federal constitutional rights against compelled self-incrimination and rights to counsel. After an evidentiary hearing, the trial court found that defendant was not subjected to custodial interrogation until being interviewed by Garrett, Myers, and Suckow, and, consequently, that his constitutional rights against compelled self-incrimination were not implicated until that time. The trial court further found that defendant knowingly, intelligently, and voluntarily had waived all his rights, including his right against compelled self-incrimination, while speaking to Quackenbush. Therefore, in the trial court's view, defendant already had waived his rights when he subjected himself to custodial interrogation by Garrett, Myers, and Suckow. Finally, the trial court concluded that defendant's waiver was not vitiated by Martin's attempt to inform defendant that Lipton had advised that he not speak to police. In the trial court's view, Martin could not invoke defendant's constitutional rights in his behalf, against defendant's own waiver of those rights and his decision to speak to Garrett, Myers, and Suckow after being told that Lipton had been hired. Accordingly, the trial court denied defendant's motion to suppress.

At trial, defendant raised the defense of insanity due to mental disease or defect. In relation to that defense, Suckow testified in the state's behalf that, in his opinion, defendant had not been suffering from delusions at the time of his crimes and had been capable of forming intent. The

jury rejected defendant's insanity defense and found him guilty of murder, among other crimes. Defendant appealed his conviction to the Court of Appeals, which, as noted, affirmed from the bench. We allowed defendant's petition for review.

On review, defendant challenges the statements that he made to Garrett, Myers, and Suckow during the interview at the police station, as well as subsequent reports and testimony based upon that interview. Among other things, defendant contends that, in withholding the fact that Lipton had attempted, through Martin, to advise defendant not to speak to police until Lipton was present, the police prevented defendant from making an informed or knowing waiver of his right against compelled self-incrimination under Article I, section 12, of the Oregon Constitution. That section provides, in part:

"No person shall * * * be compelled in any criminal prosecution to testify against himself."

In support of his position, defendant primarily relies upon this court's decisions in *State v. Haynes*, 288 Or 59, 602 P2d 272 (1979), and *State v. Simonsen*, 319 Or 510, 878 P2d 409 (1994). Defendant further contends that the police violated his right against compelled self-incrimination under the Fifth Amendment to the United States Constitution.[1]

The state responds that the police were not obligated, under any constitutional provision, to convey a message to defendant from Martin and, indeed, that the police were not even obligated to tell defendant that Martin had hired Lipton to represent defendant. The state adds that defendant knowingly waived his right against compelled self-incrimination because he was aware of the existence of that

---

[1] The Fifth Amendment to the United States Constitution provides, in part:

"No person * * * shall be compelled in any criminal case to be a witness against himself[.]"

Defendant also contends that the police violated his rights to counsel under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution. We need not address defendant's right-to-counsel arguments, or his Fifth Amendment argument, in light of our disposition of defendant's Article I, section 12, argument.

right, as well as Lipton's hiring and availability, and, none-theless, he voluntarily agreed to speak to Garrett, Myers, and Suckow.

■■■ We begin with defendant's state constitutional argument. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court decides state constitutional issues before deciding federal issues). As noted, Article I, section 12, protects against compelled self-incrimination in criminal prosecutions. That protection extends to custodial interrogations, because of the inherent level of coercion that exists in such interrogations. *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998). Further, Article I, section 12, provides a derivative right to the assistance of counsel during custodial interrogation, because "a lawyer's presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination." *Id.*; *see also Haynes*, 288 Or at 71 (explaining derivative right).

Here, the trial court determined that defendant was subjected to custodial interrogation when Garrett, Myers, and Suckow interviewed him at the police station. Neither party disagrees with that determination. Rather, the parties dispute whether the police were obligated to tell defendant that Lipton had advised defendant, through Martin, not to speak to the police until Lipton was present. As noted, defendant relies upon this court's decisions in *Haynes* and *Simonsen*, while the state argues that those cases are distinguishable from the facts at hand. We turn to a discussion of those cases, which, as explained below, provide the starting point for our analysis in this case.

In *Haynes*, the police arrested the defendant during a murder investigation and advised him of his *Miranda* rights. The defendant's wife hired a lawyer, who called the police station the morning after the defendant's arrest to arrange a visit with the defendant. The lawyer initially received inaccurate information regarding the defendant's whereabouts and was unable to speak to an on-duty police sergeant until about an hour had passed. At that point, the lawyer told the sergeant that he was coming to see the defendant. About a half-hour later, just as the lawyer was arriving at the police station, and with knowledge that the lawyer was

on his way, a different sergeant removed the defendant from the police station and obtained incriminating statements from him. That sergeant did not return the defendant to the police station for several hours. 288 Or at 61-63.

The trial court in *Haynes* denied the defendant's motion, based upon Article I, section 12, to suppress his incriminating statements. This court reversed, stating:

> "We hold that a suspect who has previously been told in general terms of his right to counsel and has waived this right *must be informed when counsel actually seeks to consult with him and must voluntarily and intelligently have rejected that opportunity,* before further statements may thereafter be taken from him and used against him."

*Id.* at 61 (emphasis added). In so holding, the court acknowledged that a suspect who already is represented by counsel validly may waive the presence of counsel during custodial interrogation, if that waiver occurs "with knowledge that [the suspect] may remain silent or may end the dialogue and ask to consult counsel at any time." *Id.* at 69. However, the court distinguished that situation from one in which, unknown to the suspect, an identified lawyer was seeking to consult with the suspect as a client:

> "We hold only that *when unknown to the person* in this situation *an identified attorney is actually available and seeking an opportunity to consult with him, and the police do not inform him of that fact,* any statement or the fruits of any statement obtained after the police themselves know of the attorney's efforts to reach the arrested person cannot be rendered admissible on the theory that the person knowingly and intelligently waived counsel."

*Id.* at 70 (emphasis added). The court emphasized that its holding was based upon the derivative right to assistance of counsel at custodial interrogation, under Article I, section 12, to protect against compelled self-incrimination. *Id.* at 71. The court reiterated that such a right may be waived; "[t]he crucial point is that it must be a knowing choice as well as voluntary in the sense of not being coerced." *Id.* at 72.

Finally, the court noted that it was immaterial that the defendant's wife, rather than the defendant, had hired the lawyer, or that the lawyer, in fact, ultimately had

declined to represent the defendant. Rather, it was sufficient that the lawyer had come to the police station "prepared at least to assume the initial responsibility of an attorney, and [the] defendant was denied the opportunity to decide whether he would retain [the lawyer] in that role or proceed without him." *Id.* at 72 n 5.

In *Simonsen*, the defendant was arrested for aggravated murder, advised of his *Miranda* rights, transported to jail, and, the following morning, removed from jail by a detective. Shortly thereafter, the defendant's court-appointed lawyer arrived at the jail, only to find the defendant gone. The lawyer then demanded that all questioning cease until he was able to consult with the defendant. Meanwhile, the detective and a deputy sheriff had transported the defendant to a location near the crime scene, where they and other deputies at the scene turned off their two-way radios. The defendant then made incriminating statements, at the same time that his lawyer was trying to contact him through the police dispatcher. 319 Or at 512-13, 512 n 2.

The defendant later pleaded guilty to aggravated murder, but moved to suppress his incriminating statements in the penalty phase of his capital trial. The trial court denied that motion, reasoning that the interrogating detective personally had not been told about the existence of the defendant's lawyer or the lawyer's specific requests. This court reversed, stating:

> "Defendant had a right to have th[e] invocation by his lawyer of his right to remain silent honored, at least until he was able to consult with the lawyer or, in the alternative, *he waived his right to such a consultation after being fully apprised of the situation that actually existed.*"

*Id.* at 514 (emphasis added). In the court's view, in light of police knowledge of the lawyer's appointment and his demand that all interrogation cease, and the failure of the police to impart that knowledge to the defendant, the state failed to demonstrate that the defendant knowingly, intelligently, and voluntarily had waived his right against compelled self-incrimination during custodial interrogation. *Id.*

The court in *Simonsen* further held that the fact that the interrogating detective was unaware of the lawyer's invocation of the defendant's right to remain silent was not dispositive:

> "* * * We hold that a lawyer's request to a responsible officer of a police organization that any questioning of the lawyer's client cease must be honored promptly by that organization, whether or not one or more members of the organization individually are ignorant of the fact or nature of the request.

> "* * * [*Here,*] *a particular lawyer actually was available and had asked that any questioning of [the] defendant cease. It also is clear that [the] defendant was not informed of those facts before he gave his videotaped confession. In that state of ignorance, [the] defendant was prevented from making an informed or knowing choice in the matter of waiver of his right to have counsel's assistance in determining whether to incriminate himself.*"

*Id.* at 517-18 (emphasis added).

■■ ˙ Taken together, *Haynes* and *Simonsen* stand for the following propositions. First, when an identified lawyer has been hired or appointed and is seeking to consult with a suspect who is subject to custodial interrogation, the suspect must be informed of both those facts before the suspect may be said knowingly to have waived his or her right against compelled self-incrimination under Article I, section 12. *Haynes*, 288 Or at 70; *see also Simonsen*, 319 Or at 514-17 (discussing *Haynes* in court-appointment context);[2] *State v. Isom*, 306 Or 587, 593, 761 P2d 524 (1988) (noting that, in *Haynes*, this court suppressed statements "even though the defendant himself had not sought to stop questioning to consult with a lawyer"); *State v. Sparklin*, 296 Or 85, 90, 672 P2d 1182 (1983) (summarizing *Haynes* as holding that "no waiver could be adequate unless [the] defendant knew his attorney

---

[2] As this case involves a lawyer hired in defendant's behalf, rather than a court-appointed lawyer, the discussion that follows refers to only hired counsel. We note, however, that the principles set out below apply equally when court-appointed counsel is involved. *See generally Simonsen*, 319 Or at 514-17 (so demonstrating in similar context).

wanted to see him"). Second, such a lawyer may invoke a suspect's right against compelled self-incrimination in the suspect's behalf; if the lawyer does so, then the police either must stop questioning the suspect or must inform the suspect that his or her lawyer has invoked the right and provide the suspect with the opportunity to accept or reject that invocation. *Simonsen*, 319 Or at 514; *see also State v. Wilson*, 323 Or 498, 511 n 8, 918 P2d 826 (1996) (suspect may invoke right to be free from compelled self-incrimination through lawyer, citing *Simonsen*).

██ Third, the suspect personally need not hire the lawyer, and either the suspect or the lawyer ultimately need not agree to the representation. Rather, so long as, at the time of the custodial interrogation, the lawyer at least had been hired in the suspect's behalf and was prepared to assume the initial responsibility of representing the suspect, the police must inform the suspect of both the lawyer's availability and, where it exists, of the lawyer's desire to consult with the suspect and any invocation of the suspect's right against compelled self-incrimination. *Haynes*, 288 Or at 72 n 5; *see also Simonsen*, 319 Or at 517-18 (respecting invocation); *Isom*, 306 Or at 593 (noting that, in *Haynes*, lawyer sought to consult at wife's instigation). Finally, when a lawyer directs his or her request that all questioning of a suspect cease to a responsible officer of a police organization, then that organization promptly must honor that request, regardless of the ignorance of some of its members concerning the request. *Simonsen*, 319 Or at 517.

This case resembles both *Haynes* and *Simonsen* in that a family member had hired a particular, identified lawyer—Lipton—who was planning to consult with defendant. Nonetheless, the state emphasizes two distinguishing facts that, on the surface, appear to set this case apart from *Haynes* and *Simonsen*: (1) unlike in *Haynes*, it is unclear from the record here if Lipton was seeking to consult with defendant immediately or whether he was on his way to the police station; and (2) unlike in *Simonsen*, Lipton did not invoke explicitly defendant's right against compelled self-incrimination; rather, Lipton sought to advise defendant, through Martin, that defendant should invoke that right until Lipton was present. However, the practical effect of

Lipton's position and actions *vis-à-vis* defendant is indistinguishable in those respects from the lawyers' actions in both *Haynes* and *Simonsen*: Lipton had been hired in defendant's behalf, was planning to consult with defendant, and took steps to ensure that defendant did not speak to police, at least until Lipton was present. To the extent of those facts, then, the foregoing principles set out in *Haynes* and *Simonsen* apply equally to this case.

The more obvious—and most significant—distinguishing fact here is that it was not Lipton, but Martin, who called the police and asked that defendant be told that Lipton had advised that defendant not speak to police until Lipton was present. The question is whether that is a distinction with a difference, respecting application of the principles set out in *Haynes* and *Simonsen*. As explained below, we conclude that it is not.

As this court held in *Simonsen*, a suspect must be *"fully apprised* of the situation that actually existed," 319 Or at 514 (emphasis added), including the availability of a hired lawyer and related information respecting invocation of the right against compelled self-incrimination, to provide a fully informed and knowing waiver of that right. Such a requirement cannot turn on the identity of a person who contacts the police to assist the suspect, provided that that person accurately conveys the information in question at the direction of a lawyer hired in the suspect's behalf (who, as discussed above, ultimately is entitled to invoke Article I, section 12, in the suspect's behalf).

**7.** We now hold that, when police receive from a third party an invocation or legal advice respecting Article I, section 12, in behalf of a suspect in custody, in which the third party purports to be speaking for a lawyer hired in the suspect's behalf, the police are bound to honor that invocation[3] or convey that legal advice, unless: (1) the police in fact do not believe that the third party is speaking for such a lawyer; and

---

[3] More specifically, as explained in *Simonsen*, 319 Or at 514, the suspect has a right to have that invocation honored, "at least until [the suspect is] able to consult with the lawyer or, in the alternative, [the suspect] waive[s] his [or her] right to such a consultation after being fully apprised of the situation that actually existed."

(2) the police have an objectively reasonable basis in fact for disbelieving the third party.

■     Here, it is undisputed that Martin had hired Lipton in defendant's behalf and that Lipton had told Martin to tell defendant not to speak to police until Lipton was present. There also is no question that Martin had called the police station at Lipton's direction. Further, the police knew that Martin was defendant's sister[4] and never questioned seriously either the fact that she had hired Lipton or the substance of Lipton's advice to defendant.[5] Those facts demonstrate that the police in fact did not disbelieve that Martin had called in Lipton's behalf to convey legal advice to defendant, respecting defendant's rights under Article I, section 12.

■ ■    It follows that, upon learning from Martin that Lipton had been hired and had advised that defendant not speak to police until Lipton was present, the police were obligated to convey that information to defendant or to refrain from questioning him altogether. Although Quackenbush told defendant that Martin had hired Lipton, he did not convey Lipton's advice that defendant invoke his right against compelled self-incrimination. As a result, defendant's waiver of that right under Article I, section 12, although voluntary, was not knowingly made and, therefore, was invalid. Accordingly, the trial court should have suppressed the evidence that resulted from that waiver—specifically, defendant's statements during his interview with Garrett, Myers, and Suckow, as well as subsequent reports and testimony relating to that interview. *See Haynes*, 288 Or at 73-74 ("[W]hen law enforcement officers have failed to admit counsel to a person in custody or to inform the person of the attorney's

---

[4] The police had been dealing with Martin throughout the day—as noted, the police initially contacted defendant at Martin's home, and Martin spoke generally at that time about hiring a lawyer for defendant.

[5] At the suppression hearing, Kohlmeyer testified that he had no reason either to believe or to disbelieve Martin, and that he viewed her statements as third-hand information. However, Kohlmeyer nonetheless advised Quackenbush to pass on *part* of Martin's message to defendant—that Lipton had been hired and was available—while withholding the rest of Martin's message concerning Lipton's advice. Under those facts, and in light of the additional fact that the state never has suggested that the police doubted Martin's veracity, it is apparent from the record as a whole that the police treated Martin's statements as true.

efforts to reach him, they cannot thereafter rely on defendant's 'waiver' for the use of his subsequent uncounseled statements or resulting evidence against him.").[6]

■ The state next argues that, even if the evidence at issue were admitted in error in violation of Article I, section 12, that error was harmless to the ultimate outcome of defendant's trial. In criminal cases, this court will affirm a conviction, notwithstanding legal error under the Oregon Constitution, "if the error did not affect a 'substantial right' of the defendant." *State v. Walton*, 311 Or 223, 230, 809 P2d 81 (1991) (quoting OEC 103(1); other internal quotation marks omitted). This court has interpreted that standard to require affirmance if there is "(1) substantial and convincing evidence of guilt * * *, and (2) little, if any, likelihood that the error affected the verdict." *Id.* (quoting *State v. Miller*, 300 Or 203, 220-21, 709 P2d 225 (1985)).

■ The record here discloses substantial and convincing evidence that defendant shot and killed Simonds. Defendant does not dispute that evidence; rather, he focuses upon the evidence relating to his insanity defense under ORS 161.295(1).[7] Defendant specifically contends that Suckow's testimony about his interview with defendant, which the

---

[6] The state contends, nonetheless, that *Haynes* and *Simonsen* are distinguishable because the defendants in those cases had been arrested on particular charges before being subjected to custodial interrogation. That distinction is immaterial, because defendant's rights under Article I, section 12, attach at custodial interrogation regardless of whether an arrest has occurred. *See, e.g., Meade*, 327 Or at 339 (discussing rights afforded under Article I, section 12, including derivative right to assistance of counsel, in context of pre-arrest custodial interrogation); *State v. Smith*, 310 Or 1, 7-8, 791 P2d 836 (1990) (discussing requirement of *Miranda*-like warnings under Article I, section 12, in context of pre-arrest custodial setting).

We also note that the state never has argued that, because Kohlmeyer and Quackenbush worked for a different police agency than Garrett and Myers, the discussion in *Simonsen*, 319 Or at 517, imputing information known to a responsible police officer to all members of the same police organization, is inapplicable here. Even so, under the unique facts of this case—where Garrett and Myers interviewed defendant at the police station for the Salem Police Department after specifically consulting with Kohlmeyer and Quackenbush—that rule from *Simonsen* is applicable here.

[7] ORS 161.295(1) provides:

"A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law."

state offered in its case-in-chief, was "the center piece [*sic*] of the state's case that defendant did not suffer from mental disease or defect" at the time of his crimes. It follows, defendant continues, that the erroneous admission of Suckow's testimony likely affected the verdict because, without that testimony, the state would have been unable to rebut sufficiently defendant's insanity defense. The state responds that, even without Suckow's testimony in its behalf, defendant did not prove his defense.[8]

After reviewing the record, we agree with defendant that the error here was not harmless. Unlike the two other expert witnesses in the case—one who testified in defendant's behalf (supporting his insanity defense) and one who testified in the state's behalf on rebuttal (refuting that defense)—Suckow had evaluated defendant on the day of the shooting, which added a dimension of credibility to his evaluation that was absent from the other expert witnesses' evaluations. Indeed, Suckow specifically testified as to defendant's ability to form intent on that day, in addition to reporting the lack of any delusional behavior on defendant's part. Further, both the other expert witnesses had reviewed Suckow's written report before evaluating defendant, and the state's other expert witness even referred to that report twice during his testimony. In sum, without Suckow's testimony and written report—as well as the testimony of Garrett and Myers regarding their interview with and observations of defendant—the quality of the state's evidence refuting defendant's insanity defense would have been weakened to a significant degree. In light of that determination, even if there were substantial and convincing evidence of defendant's guilt, we cannot say that there was little, if any, likelihood that the error in denying defendant's motion to suppress affected the verdict. Accordingly, we reverse defendant's conviction.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[8] Defendant was required to prove his insanity defense by a preponderance of the evidence. *See* ORS 161.305 (characterizing insanity defense under ORS 161.295 as affirmative defense); ORS 161.055(2) (setting out preponderance-of-the-evidence standard for affirmative defenses).