On appellant's petition for reconsideration filed October 16, 2002, and respondent's response to petition for reconsideration filed January 21, reconsideration allowed; former opinion (184 Or App 75, 55 P3d 503 (2002)) withdrawn; reversed and remanded in part; otherwise affirmed April 3, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## RICHARD CLIFFORD LYTSELL,
*Appellant.*

## CR98-1809; A107800

67 P3d 955

David E. Groom, Acting Executive Director, Office of Public Defense Services, and Susan F. Drake, Deputy Public Defender, for petition.

Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General, and Christina M. Hutchins, Assistant Attorney General, *contra*.

Before Edmonds, Presiding Judge, and Kistler and Brewer, Judges.

EDMONDS, P. J.

Brewer, J., dissenting.

## EDMONDS, P. J.

Defendant has petitioned for reconsideration of our opinion affirming his convictions for robbery and kidnapping. *State v. Lytsell*, 184 Or App 75, 55 P3d 503 (2002). We allow the petition, withdraw our former opinion, and reverse those convictions.[1]

We restate the facts as we described them in our previous opinion:

"Defendant and two other men, Sandborn and Clippinger, burglarized the home of the victim, Fornataro, on the evening of January 5, 1998. While the three intruders were inside the house, Fornataro and his son returned home. Fornataro testified that he became suspicious when he noticed that lights were on and that items in the house had been disturbed. He went to check his bedroom and, as he entered, he saw two men. One man was rummaging through a cabinet in the room, and his upper torso was hidden from view by the cabinet's doors. The other man was standing about seven feet away, holding Fornataro's handgun in his left hand. As Fornataro entered the room, he asked the two men what they were doing. Startled, the man holding the gun pulled out another gun and pointed it at Fornataro. The gunman then told Fornataro to turn around or he would shoot him. Pressing the gun against Fornataro's neck, the gunman forced him outside onto the deck. Fornataro testified that, once outside, the gunman ordered him to get down on his knees, but Fornataro refused. The gunman and the second intruder then fled through the backyard and over a fence. Fornataro also saw the profile of a third intruder who left the house through a basement window. After the intruders left, Fornataro called the police.

"While investigating the crime scene, the police found a pager that belonged to defendant in Fornataro's backyard. In addition, a police artist drew a composite facial sketch of the gunman from Fornataro's description. The sketch strongly resembled defendant. The police also conducted three photo throw-downs. In the first throw-down, Fornataro identified another man, rather than defendant,

---

[1] Defendant does not challenge his convictions for burglary and theft.

as the gunman. That throw-down did not include defendant's photograph. The second throw-down included defendant's photograph, and Fornataro identified him as the gunman. In a third throw-down, which also did not include defendant's photograph, Fornataro commented that the person in one of the photos resembled the gunman, but he told the officer that he was certain that it was not the gunman.

"The police eventually arrested defendant for the charged offenses. Sandborn also was in custody but later escaped; at the time of defendant's trial, Sandborn had not been apprehended.

"Defendant waived his right to a jury trial, and the case was tried to the court. At trial, defendant admitted that he was one of the burglars but denied being the gunman. He testified that he, Sandborn, and Clippinger were in the bedroom when Fornataro entered. According to defendant, when Fornataro entered, defendant was crouched behind the bed looking underneath it, Clippinger was searching through a cabinet, and Sandborn was standing beside the bed. As soon as Fornataro confronted them, Sandborn pulled the gun out and ordered Fornataro to turn around. Sandborn then ordered Fornataro to lead them outside onto the deck. However, when Fornataro turned around, Clippinger jumped out the bedroom window. Defendant followed Sandborn and Fornataro through the house, but he eventually fled through another bedroom window. Thus, according to defendant, Sandborn was the only person on the deck with Fornataro. After fleeing, defendant and Sandborn went to a nearby house that belonged to Cannon, a friend of defendant's mother. Defendant's teenage stepsister, Boyd, was at the house with several of her friends, including Byles. When defendant and Sandborn arrived at Cannon's house, Boyd let them in and the two men ran down into the basement. Defendant stated that, after cleaning up, he and Sandborn returned upstairs and talked with the girls.

"Fornataro testified that, during his encounter with the gunman, he had carefully studied the gunman's face for the specific purpose of later identifying him. Then, in open court, he identified defendant as the gunman. Fornataro also described his thoughts during the photo throw-downs.

He explained that, in the first throw-down, he had identified a man whose facial features were similar to defendant's, but he told the officer that the person in the picture was thicker in the neck and torso than the gunman. He stated that he had quickly identified defendant as the gunman during the second throw-down, and, in the final throw-down, he noticed a man who looked similar to the gunman but, even at that time, he had been 'absolutely sure [that] it was not the gunman.'

"Defendant called as a witness the police officer who conducted the first two throw-downs. The officer testified that Fornataro had identified a suspect in 38 seconds during the first throw-down and had identified defendant in 2 minutes and 35 seconds during the second throw-down. Furthermore, according to the officer, Fornataro mentioned during the second throw-down that another man somewhat resembled the gunman.

"Near the end of defendant's case-in-chief, and after defendant testified, he sought to introduce in evidence hearsay declarations allegedly made by Sandborn that implicated Sandborn as the gunman. Defendant made an offer of proof that included the in-court testimony of three witnesses. Two of the witnesses, Boyd and Byles, testified concerning statements Sandborn allegedly made when he and defendant were at Cannon's house on the night of January 5. Boyd testified that Sandborn told Boyd and Byles that he had held the gun to Fornataro's head so that he, defendant, and Clippinger could escape. Byles testified that she heard Sandborn tell the group that 'he had made a guy get down on the ground and held [the gun] up to the guy's head.' However, she later testified that she did not remember Sandborn's exact words, only that 'he said—told the guy to get down—down to the ground.' The third witness, Lohr, testified that several months before defendant's trial, but after defendant had been arrested, Sandborn told her that 'he feels bad because [defendant is] going to be doing his time for him.'

"Defendant argued that the declarations were admissible as statements against Sandborn's penal interest under OEC 804(3)(c)[1] and that the declarations exonerated defendant of any crimes involving the use of the gun. Defendant contended that the statements were sufficiently corroborated because the two witnesses heard 'relatively the same

statement regarding the gun under the same circumstances.' Furthermore, defendant contended that the statements were consistent with the events that occurred during the episode and that Sandborn voluntarily made the statements in surroundings in which he felt comfortable. Defendant urged that Sandborn's comment about defendant doing 'his time' was against Sandborn's penal interest, and that it also corroborated Sandborn's statements to Byles and Boyd.

"The state conceded that the declarations allegedly made to Byles and Boyd constituted statements against penal interest, but it argued that the declaration that defendant was going to be 'doing his time' was not against Sandborn's penal interest. The prosecutor also argued that all of the statements were inadmissible because they lacked sufficient corroboration or indicia of reliability. Specifically, the state focused on an inconsistency in the evidence: Although Byles testified that Sandborn told her and Boyd that he had forced Fornataro to the floor, Fornataro testified that he had refused to comply with the gunman's demand. In addition, the state pointed to the close relationship between the witnesses and defendant and suggested that bias in favor of defendant may have motivated them to lie.

"At the conclusion of defendant's offer of proof, the trial court excluded the proffered evidence. It reasoned:

" 'The only question before me at this time is the admissibility of the statement. [The state] pointed out, and I previously found, that [Sandborn] is unavailable as defined by the evidence code.

" 'There are two other criteria that I think have to be met. First, the statement has to be a statement against penal interest. And I do find that the statement of [Sandborn] is a statement against penal interest. That alone is not enough to have it come into these proceedings.

" 'The Court in [*State v. Thoma*, 313 Or 268, 834 P2d 1020 (1992),] said there needs to be some corroborating evidence. Or to say it a different way, beyond a statement against penal interest there must be some assessment as to the reliability of the proffered evidence.

" 'The *Thoma* court specifically said that they were not deciding on what unavailable—excuse me, what criterion would necessarily corroborate any statement, but there are seven things that they made reference to, and I would like to contrast or compare to this case.

" 'There is a connection between the defendant and the declarant.

" 'There is a known connection between the declarant, the defendant and all of the witnesses.

" 'The statement was made on a single occasion. And in making that finding, I am finding that the statement that the defendant would be doing his time is so vague as to not be corroboration. And I'm finding it vague for this reason. If the defendant is, in fact, convicted of burglary and no other charge, and if the evidence I have before me is accurate, and if [Sandborn] is never caught, it could still be said that the defendant is doing [Sandborn's] time.

" 'I further find that the statement of [Sandborn] is factually inconsistent with the testimony that's presented in this case in one particular important element, and that is the statement about whether or not he made the victim get down on the ground. The testimony in this case by the victim, and it has not been contradicted by the testimony of defendant, is that a gun was pointed to his head, he was walked outside, he was told to get down on the ground, he refused to get down on the ground and, in fact,—and I don't have my—that page of my notes in front of me, but said something to the effect that if you're going to shoot me, you'll have to shoot me standing up.

" 'So as I analyze the corroboration and the corroboration that's been argued by [defendant], I come to one conclusion, and that's the statement against penal interest and that's the only conclusion I can come to. I do not find that there's sufficient corroboration and the statements of [Sandborn] will be excluded and will not be considered by me.'

"After the court excluded the statements, defendant called three additional witnesses. The first witness, Stickley, testified that she previously had heard Sandborn use a distinctive expression involving the use of a gun. The

second and third witnesses, Lohr and Boyd, identified a photograph of Sandborn. In rebuttal, the state recalled Fornataro, who reiterated that defendant was the gunman and testified that the man in the photograph identified by Lohr and Boyd was not the gunman.

"At the conclusion of the trial, the court found defendant guilty of each of the charged offenses. The court explained its ruling as follows:

" 'When [the victim] first testified, I did with him what I did with every witness, I made an initial evaluation whether I thought he was credible or not credible. Having made that initial determination, I weighed that testimony against every other witness's testimony, and, I think, reevaluated whether I thought he was credible or not credible. That's not true just of [the victim], it's true of every witness who testified.

" 'I'm troubled by one thing. There are a number of things that cause me to reach my decision. I found [the victim] initially to be a credible witness. And in finding him to be a credible witness, I found his initial account to be credible. When the defendant testified, the defendant put himself in a position that his head was under the bed, that [the victim] could not, should not have been able to see him, and there's nothing the defendant said that changed that.

" '[Defense counsel], your argument that his picking [defendant's] picture out of a photo throw-down because the throw-down is overly suggestive, I do not find that it is. That he was the only one who had a threatening look on his face or that it was in the number one position does not give me a satisfactory explanation of why he made the identification. I do find that [the victim's] statement that he studied the face of the gunman for the specific purpose of making an identification later to explain why he made that identification.

" 'There are a number of other things that I considered in reaching my decision, but I do find the defendant guilty of all of the charges against him.'

"On appeal, defendant assigns error to the exclusion of Sandborn's statements. He argues that the statements were admissible under OEC 804(3)(c). Moreover, defendant asserts that the error was not harmless because the trial

court did not consider the statements in reaching its verdict, and they were critical to the defense theory that Fornataro had misidentified him as the gunman. The state responds that Sandborn's statements were not admissible and, regardless, any error was harmless.

---

"[1] OEC 804 provides, in part:

" '(3)   The following are not excluded by ORS 40.455 if the declarant is unavailable as a witness:

" '* * * * *

" '(c)   A statement which * * * at the time of its making * * * so far tended to subject the declarant to * * * criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.' "

*Lytsell*, 184 Or App at 77-83.

In our former opinion, we did not decide whether Sandborn's statements were admissible. Instead, we held that, even if they were, the trial court's decision to exclude them was harmless error. We now conclude, for reasons that we describe later, that any error was not harmless. We must therefore first determine whether the trial court erred in refusing to admit the evidence; if it did not, there is no issue of harmlessness.

We agree with the trial court and the state that Sandborn's statements to Byles and Boyd were against his penal interest, while his statement to Lohr was not. In order for those statements to be admissible under OEC 804(3)(c), corroborating circumstances must clearly indicate their trustworthiness. The appellate courts have not given a thorough discussion of the corroboration requirement under OEC 804(3)(c), *see Wood v. Baldwin*, 158 Or App 98, 104, 972 P2d 1221, *rev den*, 329 Or 61 (1999), and we need not do so here. On appeal, the parties emphasize two issues: first, whether

the trial court could consider the credibility of the witnesses—Byles and Boyd—who testified that Sandborn made the statements, and second, whether the other circumstances are sufficient to serve as corroboration.

■　　We agree with the state that the trial court could consider the credibility of Byles and Boyd. Although the language of OEC 804(3)(c) does not answer the question of whether the trial court may consider their credibility, the legislative commentary to the rule makes the legislature's intent clear. The language of the rule is ambiguous because its requirement that corroborating circumstances indicate "the trustworthiness of the statement" could mean either that only the statement of the hearsay declarant requires corroboration or that the evidence that the declarant actually made the statement also requires corroboration. The legislative commentary resolves the ambiguity. It states:

> "The common law refused to concede the adequacy of [statements contrary to] penal interest in large part because it distrusted evidence of confessions by third persons offered to exculpate the accused. This reflected a suspicion that *either the fact or the contents of the confession* were fabricated, enhanced *in either case* by the required unavailability of the declarant. To meet that concern, [OEC] 804 requires that a statement against penal interest be corroborated."

*Reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 804.04[2] (4th ed 2002) (emphasis added). The legislature's concern, thus, was to avoid fabrication of the fact of the statement as well as of its contents. Thus, the trial court could appropriately consider evidence that relates to whether Sandborn actually made the statements as well as to whether it is otherwise trustworthy.

■　　In this case, the only part of the trial court's analysis that might implicate Byles's or Boyd's credibility was its comment that there was a connection between them, Sandborn, and defendant. However, its discussion of that point focuses on the trustworthiness of Sandborn's statements, not on whether Byles and Boyd accurately reported what he said. In *Thoma*, which the trial court cited in its discussion, the Supreme Court relied in *dictum* on the absence of a known

connection between the defendant and the declarant to support its conclusion that there was sufficient corroboration for the declarant's statements.[2] 313 Or at 278-79. There was no dispute in *Thoma* about whether the declarant had made the statements in question, so the lack of a connection related to the trustworthiness of the statements, not to whether they were made. The trial court in this case did not suggest, in explaining its ruling, that the connection between Sandborn, defendant, and Boyd and Byles undercut their credibility as witnesses.[3] In the rest of its discussion, it assumed that Sandborn had in fact made the statements. We accept those conclusions and turn to the issue of the sufficiency of the corroborating circumstances.[4]

A number of facts tend to corroborate Sandborn's statements. First, he made them almost immediately after the events to a group of people whom he had reason to trust. His action could well have been in part an explanation of why defendant and he had made so hurried an appearance and in part a way of releasing the tension from having been surprised during the burglary and having made so dramatic an escape. Second, Sandburn did not make the specific statements at issue in isolation. Rather, they are part of Sandborn's general description of what had happened that evening and of his role in it. The specific statements come naturally from the flow of his discussion. At the time, Sandborn did not know that the burglary would be discovered, that he would make himself unavailable, and that defendant would be tried for things that, according to the statements, Sandborn had done. Thus, at the time there was no apparent reason for him to think that what he said would

[2] The court's holding in *Thoma* was that the defendant failed to show that the declarant was unavailable. Thus its discussion of corroboration was *dictum*.

[3] Boyd is defendant's stepsister. Byles was 14 years old at the time and Boyd's best friend. They, along with two other girlfriends, were at Cannon's house when Sandborn came to Cannon's house and made the statements.

[4] Under OEC 104(1) the trial court determines the admissibility of hearsay evidence as a preliminary question of fact. We review its factual determinations for whether there is any evidence to support them, *State v. Rogers*, 330 Or 282, 313 n 9, 4 P3d 1261 (2000), and its legal determinations as matters of law, *see State v. McCapes*, 139 Or App 426, 429, 912 P2d 419, *rev den*, 324 Or 176 (1996) (reversing trial court determination under OEC 104(1) that evidence was relevant on ground on which trial court relied).

benefit defendant or anyone else. Third, Fornataro quoted the gunman as using a phrase that Sandborn, but not defendant, frequently used. According to Fornataro, the gunman threatened him, saying, "I'll cap your ass, nigger." Witness Stickley testified that, while she had often heard Sandborn use that phrase, she had never heard defendant use it. Fourth, the statements are generally consistent with Fornataro's description of what happened, aside from Byles's uncertainty about whether Sandborn said that he made the "guy" get down or only told him to do so.[5] Finally and most importantly, the police found physical evidence that corroborates defendant's position that Sandborn, rather than he, was the gunman. Defendant's pager was seized from underneath the window of a different bedroom from the one where Fornataro surprised the burglars. It was not found near the deck where the gunman took Fornataro. That fact supports defendant's testimony that he fled through that window, which would mean that he was not the gunman.[6]

There is no magic formula to the corroboration requirement. Each case will have its own particular circumstances. The legislature has told the courts to construe the requirement "in a manner that effectuates its purpose to circumvent fabrication." Legislative Commentary to OEC 804(3)(c), *reprinted in* Kirkpatrick, *Oregon Evidence* § 804.04[2]. There are significant indicia of reliability in Sandborn's statements as explained above, and the surrounding circumstances are also consistent with its accuracy. The corroboration is sufficient for the statements to be admissible, and the trial court erred in excluding them.[7]

---

[5] The trial court emphasized the apparent conflict between Byles's version of Sandborn's statements and Fornataro's testimony that he did not obey the gunman's order to get down. The fact that the evidence is in conflict does not make it inadmissible. Such a conflict could, of course, be an issue for the trier of fact.

[6] The dissent suggests that defendant may have dropped the pager at a different time. That alternate explanation does not affect the corroborating character of the pager's location. That would be an issue for the trier of fact.

[7] The fact that there is sufficient corroboration for the statements to be admissible does not, of course, mean that the trier of fact *must* accept either that Sandborn actually made them or that they accurately describe what occurred. That the statements are corroborated simply means that they are worthy of the factfinder's consideration.

We turn to whether the trial court's error affected defendant's substantial rights—that is, whether or not it was harmless.[8] OEC 103(1)(b).[9] Defendant, relying on *State v. Joslin*, 332 Or 373, 387, 29 P3d 1112 (2001), states the standard for harmless error as whether there is " '(1) substantial and compelling evidence of guilt * * *, and (2) little, if any, likelihood that the error affected the verdict.' " (Quoting *State v. Walton*, 311 Or 233, 230, 809 P2d 81 (1991).) He argues that that standard does not permit the reviewing court to assess the credibility of witnesses or to evaluate the evidence. The state, relying on *State v. Cunningham*, 179 Or App 359, 382, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002), *rev pending*, (2003), states the test as involving two questions: "First, what was the relative strength of the parties' evidence? And second, in the totality of the parties' evidence, how significant was the erroneously [excluded] evidence?" It argues that that test involves evaluating the quality of the evidence admitted and excluded.

■ ■    Contrary to defendant's apparent assumption, *Joslin* and *Cunningham* do not state separate tests; rather, *Cunningham* breaks the second portion of the test in *Joslin*—the likelihood that the error affected the verdict—into two parts. As the substantive discussion in *Cunningham* indicates, applying that test necessarily involves evaluating the relative strength of the state's case as compared to the defendant's case both with and without the challenged evidence.[10] The purpose of harmless error analysis is to determine whether the evidence in question could have affected the ultimate verdict; if not, the error was harmless. It is difficult to conceive how we could make that determination without attempting to determine how the trier of fact was likely to evaluate the evidence as a whole.

---

[8] This case was tried to the court. We do not believe that the determination of whether the error was harmless is affected by that fact.

[9] We reaffirm our rejection in our former opinion of the state's argument that, because the trial court rejected Sandborn's statements as being insufficiently corroborated, it would not, in its role as the trier of fact, have given the statements any weight. *Lytsell*, 184 Or App at 83-84.

[10] In *Cunningham* the issue involved the erroneous admission of evidence in the state's case. Thus, the issue there was the relative strength of the state's case, with and without the challenged evidence, as compared to the defendant's case.

■       In this case, there is substantial evidence from which a trier of fact could find that defendant was the gunman: he was admittedly one of the burglars, and Fornataro clearly and unequivocally identified him as the gunman. The trial court relied primarily on that identification in convicting defendant, noting that, at the time of the burglary, Fornataro carefully observed the gunman in order to be able to identify him later. In our previous opinion, we held that the evidence of Sandborn's statements would not have affected that conclusion. We emphasized that the composite sketch that a police artist drew, based on Fornataro's description, shortly after the burglary strongly resembled defendant and that Fornataro's positive identification of defendant in the second throw-down and at trial contradicted defendant's testimony that he was hidden behind the bed when Fornataro entered the bedroom. We stated that, in contrast, defendant's version of events was improbable. *Lytsell*, 184 Or App at 85. The evidence came from defendant's close friends and a relative and, more significantly, it did not explain how, in light of defendant's testimony of the physical facts, Fornataro was able to identify defendant so credibly or why he insisted that Sandborn was not the gunman. Thus, we concluded, the excluded statements would not have been significant to the trier of fact. *Id.* at 86.

On reconsideration, we conclude that we did not adequately evaluate the evidence as a whole. In particular, we did not recognize the questions that the record as a whole presents concerning Fornataro's identification of defendant as the gunman and the way in which Sandborn's identification of himself as that person could have changed the evaluation of the evidence as a whole. First, Fornataro identified two different people as the gunman in two different throw downs. According to the officer, his first identification— which he later repudiated—came in little more than half a minute, while his second identification—of defendant—came only after he had studied the pictures for two and a half minutes, suggesting that he had some difficulty with the identification. Second, we have reviewed the composite sketch of the gunman; in contrast to the dissent, we believe that whether the sketch resembles defendant is at the least

subject to reasonable debate.[11] Third, Fornataro stated that the gunman was about his height. Defendant is significantly taller than Fornataro, while Sandborn is about the same height. Fourth, the gunman used a phrase that Sandborn, but not defendant, was known to use.

· Most significantly, in our previous opinion we did not fully recognize the effect of Sandborn's statements on the trier of fact's evaluation of the evidence. If the trier of fact believed those statements, they were sufficient in themselves to lead to defendant's acquittal of the robbery and kidnapping charges. Sandborn, who unquestionably participated in the burglary, described what had happened almost immediately afterwards and in the process described himself as doing the things with which defendant was charged. When viewed in the light of those statements, the other evidence against defendant on the robbery and kidnapping counts loses much of its weight and there will almost certainly be a reasonable doubt about defendant's guilt of those charges.[12]

As the dissent points out, it is not certain that the trier of fact would believe Sandborn's statements. The problems that it identifies, however, are those that are inherent in those kinds of statements. A person who has just committed a crime is unlikely to talk about it to passers-by whom he or she meets on the street; rather, the person will do so to friends and close associates. The inevitable result is that evidence of the statements will have to come from those friends and associates. The differences in the witnesses' memories about the details of Sandborn's statements are not surprising or unusual. Indeed, they may suggest that the witnesses are remembering an actual event rather than recounting a story that they made up—and carefully coordinated—for use at the trial. Those are all issues for the trier of fact's consideration;

---

[11] Although a photograph of Sandborn was admitted into evidence, defendant failed to include it in the exhibits on appeal. As a result, we are unable to compare that photograph with the sketch.

[12] The trial court, the state, and the dissent all emphasize the difficulty of showing, under defendant's testimony, that Fornataro had a chance to see defendant's face. In light of the state's burden of proof, we do not think that that difficulty is sufficient to say that the exclusion of the evidence was harmless.

they are not sufficient to affect our analysis of whether the evidence could have affected the outcome of the trial.

We turn to the *Cunningham* inquiries, beginning with the relative strength of the parties' evidence. As we have noted, Fornataro's identification of defendant was clear and unambiguous; the trial court expressly found him to be a credible witness. In addition, Fornataro had purposely studied the gunman's face in order to be able to identify him later, but in defendant's version of events he would have had little or no opportunity to see defendant before viewing the second throw down. On balance, the eyewitness evidence against defendant is strong. The problems that we identified in the previous paragraph are not necessarily unusual in any eyewitness identification, and they may have had little effect on the strength of the case in the absence of Sandborn's statements.

The second *Cunningham* inquiry concerns the significance of the excluded evidence in light of the totality of the parties' evidence. Here, the evidence that Sandborn, immediately after the burglary, both described the identical actions that Fornataro later described and said that he was the one who did them is potentially powerful evidence. It both confirms Fornataro's story about the burglary and raises questions about his identification of the gunman. That is particularly the case because Sandborn's testimony is consistent with the physical evidence concerning the location of defendant's pager. In light of Sandborn's statements, the problems with Fornataro's identification take on new significance, potentially creating a reasonable doubt about its accuracy that was not otherwise present.[13] A reasonable doubt about the accuracy of Fornataro's identification would translate to a reasonable doubt about defendant's guilt. We are mindful of the fact that the credibility of Boyd and Byles is critical to the weight to be given to Sandborn's statements. Nevertheless, the credibility of a witness is generally within the exclusive province of the factfinder, and rightly so. In the absence of any preruling finding by the trial court that Boyd and Byles

---

[13] For example, if Fornataro carefully examined defendant's face, as the dissent emphasizes, how did he fail to notice that defendant was considerably taller than he?

were not credible, we are unable to conclude that their veracity is not an issue for the factfinder. Thus, in the consideration of the totality of the evidence, the excluded evidence was potentially of great significance. Its exclusion was not harmless.

We do not mean to suggest that Sandborn's statements *would* have changed the result. Rather, the statements would have sufficiently changed the mix of the evidence so that they *could* have done so. In light of that conclusion, we certainly cannot say, as *Joslin* requires, that there was little, if any, likelihood that the error affected the verdict. We therefore reverse the robbery and kidnapping convictions and remand for a new trial.

Reconsideration allowed; former opinion withdrawn; convictions for robbery and kidnapping reversed and remanded for new trial; otherwise affirmed.

**BREWER, J.,** dissenting.

The majority allows defendant's petition for reconsideration and withdraws our former opinion because, in its view, the trial court's exclusion of hearsay evidence proffered by defendant was reversible error. The majority concludes that the evidence should have been admitted because it was sufficiently corroborated, and that, contrary to our previous opinion, its exclusion was not harmless error. Because I believe that the evidence would not have changed the outcome of the case if it had been admitted, I dissent.

In our previous opinion, we concluded that "we need not address the issue of whether the trial court erred in excluding the evidence because, even if it did, there is little likelihood that the error affected the court's verdict." *State v. Lytsell*, 184 Or App 75, 83, 55 P3d 503 (2002). The majority addresses the issue on reconsideration and concludes that the trial court erred in excluding the evidence because it was sufficiently corroborated. The majority identifies several facts that, it asserts, corroborate the hearsay statements. I do not necessarily disagree with the majority's conclusion that the statements were sufficiently corroborated to be admissible. However, in considering whether the trial court's error, if any, in excluding the evidence was harmless, I take issue

with the majority's characterization of the evidence that it deems most important to its admissibility analysis.

In that regard, the majority asserts:

"Finally and most importantly, the police found physical evidence that corroborates defendant's position that Sandborn, rather than he, was the gunman. Defendant's pager was seized from underneath the window of a different bedroom from the one where Fornataro surprised the burglars. It was not found near the deck where the gunman took Fornataro. That fact supports defendant's testimony that he fled through that window, which would mean that he was not the gunman."

187 Or App at 180. Defendant made no such argument to the trial court. That is unsurprising because defendant testified that he checked several doors and windows outside the house while scouting for an access point. He could have easily dropped the pager in the process of trying to gain entry. Defendant also testified that he entered the house through a window, and the record does not show that he entered through a different window from the one through which he claims he left the house. Because defendant could have dropped the pager while scouting for access or entering the house, the pager's location did not corroborate the hearsay declarations of Sandborn or, for that matter, in any way undermine Fornataro's identification of defendant as the gunman.

However, regardless of whether the hearsay statements were sufficiently corroborated to be admissible, I submit that their exclusion was harmless on the record before us, especially given the trial court's stated reasoning for its verdict.

As we observed in our previous opinion:

"Evidentiary error is not presumed to be prejudicial, OEC 103(1), and it is considered harmless if there is little likelihood that it affected the verdicts reached. *State v. Johnson*, 313 Or 189, 201, 832 P2d 443 (1992). It is permissible to divide that test into two separate inquiries. First, what was the relative strength of the parties' evidence? And, second, in the totality of the parties' evidence, how significant was the excluded evidence?"

*Lytsell,* 184 Or App at 83 (citing *State v. Cunningham,* 179 Or App 359, 382, 40 P3d 1065, *adh'd to on recons,* 184 Or App 292, 57 P3d 149 (2002)). Although the majority acknowledges that there is "substantial evidence" in the record to support a finding that defendant was the gunman, it asserts that, in our previous opinion, "we did not adequately evaluate the evidence as a whole" and that, in light of Sandborn's statements, the questions surrounding Fornataro's identification of defendant as the gunman "could have changed the evaluation of the evidence." 187 Or App at 182. I respectfully disagree.

Each of the facts in the record on which the majority relies in support of its harmless error analysis was familiar to the trial court. First, in our previous opinion, we acknowledged that Fornataro had identified another person as the gunman in one of the throw-downs. The trial court heard that testimony, and the court obviously believed Fornataro's explanation concerning it. Second, I do not agree that the resemblance of the composite sketch to defendant is subject to reasonable debate. I submit that it does resemble defendant, down to the moustache and goatee, and it was also in evidence before the trial court. Third, any discrepancy between defendant's height and Fornataro's height also was in evidence before the trial court. Fourth, the gunman's use of a phrase that Sandborn allegedly used but defendant did not was also before the trial court. One of defendant's witnesses, Stickley, testified to that effect.[1] In the trial court's view, the

---

[1] In fact, Fornataro testified that the phrase did not sound natural coming from the gunman:

"[DEFENSE COUNSEL:] This statement [I'll cap your ass, nigger] that comes out of someone's mouth, did it seem halting in the way they said it, in other words, was it jerky or did it come out as one threatening statement?

"[FORNATARO:] It was jerky.

"[DEFENSE COUNSEL:] Okay.

"[FORNATARO:] And that was the other reason now you're asking me my opinion, that I felt that I might be in danger. I couldn't tell if they were on drugs or that person was on drugs or what. I didn't know. It didn't come out as a — it didn't sound natural. *It didn't sound like it was everyday language.* And it could have been said to intimidate me. I don't know. But it didn't come out naturally, and I didn't know the mental state of the person pointing the gun at me."

(Emphasis added.)

Had the gunman actually been Sandborn, who allegedly frequently used the phrase, it is unlikely that the phrase would have sounded "jerky" and unnatural

foregoing evidence obviously had little effect on the strength of the state's case. In my view, there is little likelihood that Sandborn's alleged statements would have tipped the credibility scales in the trial court's mind toward reasonable doubt as to defendant's guilt.

In so concluding, I will not repeat everything we said in our previous opinion about the relative strength of the parties' evidence. But certain facts bear emphasis. Although Fornataro's identification of defendant was imperfect, the fact remains that he positively and convincingly identified defendant as the gunman both in court and in a throw-down. Moreover, the trial was a swearing match between defendant and the victim. Both took the stand and the trial court had the opportunity to assess their credibility, something that is a challenge for us to do on the appellate record. The evidence showed that defendant lied to police about his involvement in the burglary. When he was first brought in for questioning, he denied any involvement at all. He persisted in that lie even after police told him that they had found his pager at the crime scene. When all was said and done, defendant had no credibility with the trial court. The case against defendant was strong.

On the other hand, defendant's theory of defense—that Fornataro misidentified him as the gunman—was weak. It depended on the trial court finding reasonable doubt based on an inference that Fornataro misidentified defendant as the gunman but correctly—and luckily—recognized him as one of the burglars.

In his petition for reconsideration, defendant argues that the record does not support an inference that Fornataro had no opportunity to identify him at the crime scene, a fact that we emphasized in our previous opinion and that the trial court found to be true. However, under defendant's version of events, that is the *only* reasonable reading of the record. Fornataro testified that, when he entered the master bedroom, he encountered *two* men, one standing about seven feet away holding his handgun and the other rifling through

coming from him. The halting and unnatural use of the phrase by the gunman does not support the majority's belief that it corroborates Sandborn's declaration that he was the gunman.

drawers. According to Fornataro, the drawers blocked his view of the second burglar's upper torso. Fornataro stated that he focused on the gunman's face until the gunman told him to turn around. He was then forced out of the house onto the deck by the gunman and the second burglar, who both subsequently fled over the backyard fence. Fornataro then saw a third burglar flee through a basement window.

Defendant, on the other hand, testified that *all three* burglars were in the master bedroom when Fornataro entered:

> "I was on my knees with my head underneath the bed and my arms stretched out in front of me trying to see what I could find underneath the bed. And I heard a voice, Hey, what are you guys doing? Or, Hey, what are you doing?

> "And I pulled my head out of the bed, and right about the time my head came out from underneath the bed, I turned to the left and I seen—I seen the guy in the doorway, obviously Mr. Fornataro, in the doorway. *And [Sandborn] was, like, behind me, in between both of us.* And he was facing the wall behind me, and he turned and pulled a gun, which I thought to be the 9 millimeter that was taken from the home, and put it in Mr. Fornataro's face.

> "* * * * *

> "[Clippinger] was on the other side of the bed against— I think going through the drawers in the headboard, or whatever it would be called. I'm not sure."

(Emphasis added.) According to defendant, Clippinger then left the house through the master bedroom window, and defendant himself jumped out of the window of another bedroom while Sandborn forced Fornataro outside at gunpoint. According to defendant's testimony, he and Sandborn then fled through the backyard and over a fence.

Under defendant's version of events, Fornataro could have seen his face only when he was crouching behind the bed—with Sandborn standing between him and Fornataro—before Sandborn forced Fornataro to turn around and leave the room. Defendant's story was highly implausible in view of the fact that Fornataro testified that

he saw only two people in the room, neither of whom, according to the defense theory, was defendant. In order to believe that Fornataro misidentified defendant as the gunman under those circumstances, the trial court would have had to find either that Fornataro forgot that a third burglar was in the bedroom but nonetheless confused the face of a crouching and hidden defendant with the face of the actual gunman, Sandborn, or, alternatively, that Fornataro lied when he identified defendant as the gunman. That is not what the court believed. It found:

> "When Mr. Fornataro first testified, I did with him what I did with every witness, I made an initial evaluation whether I thought he was credible or not credible. Having made that initial determination, I weighed that testimony against every other witness's testimony, and, I think, reevaluated whether I thought he was credible or not credible. That's not true just of Mr. Fornataro, it's true of every witness who testified.

> "I'm troubled by one thing. There are a number of things that cause me to reach my decision. I found Mr. Fornataro initially to be a credible witness. And in finding him to be a credible witness, I found his initial account to be credible. *When the defendant testified, the defendant put himself in a position that his head was under the bed, that Mr. Fornataro could not, should not have been able to see him, and there's nothing the defendant said that changed that.*"

(Emphasis added.)

According to the majority, the excluded hearsay "raises questions about [Fornataro's] identification of the gunman," 187 Or App at 184, because "Sandborn's testimony is consistent with the physical evidence concerning the location of defendant's pager." *Id.* As explained above, the location at which the pager was found is nothing more than a neutral fact. It is not significant evidence for the defense that the trial court or we, in our previous opinion, failed to adequately appreciate.

Given the relative strength of the parties' evidence in its totality, it is highly unlikely that the trial court would have given any weight to the hearsay statements had they

been admitted. The evidence of the statements, of course, did not come from Sandborn's own lips or from a neutral source. It came from defendant's close friends and a relative, who first surfaced with it shortly before trial. Under the circumstances, the trial court almost certainly would have dismissed the hearsay as the sort of fabrication that not infrequently surfaces when an accused person is confronted with overwhelming evidence of his or her guilt. But most importantly, whether or not the witnesses truthfully testified to statements actually made by Sandborn, those statements do not explain why, in light of defendant's own testimony regarding the physical facts, Fornataro was able credibly to identify defendant as the gunman or, for that matter, why he steadfastly asserted that Sandborn was not the gunman.

I adhere to the conclusion we reached in our previous opinion:

> "The trial court found Fornataro credible and did not believe defendant's version of events. The excluded evidence would not have obviated the inherent implausibility of the defense theory that had, in the court's mind, tilted the balance in favor of guilt."

*Lytsell*, 184 Or App at 86. As a consequence, I remain convinced that the court's verdict would have been the same even if the hearsay evidence had been admitted.

Accordingly, I respectfully dissent.